**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
**JIMARZARETTE ESTEVEZ, DEANNA MANCINI,**
**and DIANE MEKULI,**

                               **PLAINTIFFS,**


               -against -                              <u>**COMPLAINT**</u>


**BERKELEY COLLEGE, and**                         <u>**JURY TRIAL DEMANDED**</u>
**JOEL MARTINEZ, individually.**


                     **DEFENDANTS.**
-----------------------------------------------------------------X

The Plaintiffs, Deanna Mancini, Jimarzarette Estevez, and Diane Mekuli, through

undersigned counsel, complain about the Defendants, Berkeley College and Joel Martinez, as

follows:

<u>**INTRODUCTION**</u>

1.      This is an employment discrimination case involving claims of gender-related

hostile work environment and disparate treatment, and retaliation, including retaliatory

termination of employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e *et seq*. ("Title VII"), and the New York State Human Rights Law, Executive Law § 290 *et*

*seq*., as amended (the "NYSHRL").

<u>**JURISDICTION AND VENUE**</u>

2.      The Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §

1331 and 28 U.S.C. § 1343.

3.      The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C.

§ 1367. Plaintiffs' state law claims are so closely related to Plaintiffs' claims brought under Title

VII that they form part of the same case or controversy as those terms are defined pursuant to Article III of the United States Constitution.

4.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), and Title VII's special venue provision, 42 U.S.C. § 2000e-5(f)(3), because the events or omissions giving rise to the claims occurred within this judicial district.

### THE PLAINTIFFS

5.     Plaintiff Jimarzarette Estevez ("Estevez") is an woman who lives in Westchester County in the State of New York.

6.     Plaintiff Estevez worked as an admissions counselor at Berkeley College's campus in White Plains from December 2012 until January 2017, when she was promoted to the position of Assistant Director for High School Admissions, the position she occupied until she was illegally fired by Defendants in September 2017.

7.     Plaintiff Deanna Mancini ("Mancini") is a woman who lives in Westchester County in the State of New York.

8.     Mancini began working as an admissions counselor for Berkeley College at the White Plains campus  in or about May 2013. In November 2016, Mancini was promoted to the position of Director of Adult Admissions and worked in that position until her employment with Berkeley College was illegally terminated by Defendants in September 2017.

9.     Plaintiff Diane Mekuli ("Mekuli") is a woman who lives in Westchester County in the State of New York.

10.     Mekuli worked as an admissions counselor at Berkeley College's White Plains campus from in or about 2003 to in or about September 2017, when she was illegally fired.

11.     Estevez, Mancini and Mekuli will be referred to herein as "the Plaintiffs."

**THE DEFENDANTS**

12.     Defendant Berkeley College ("Berkeley College") is a private for-profit college with locations in New York and New Jersey.

13.     Defendant Joel Martinez was at all relevant times employed by Berkeley College as the White Plains Campus Operating Officer ("COO").

14.     Berkeley College and Martinez will be referred to herein collectively as "the Defendants."

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

15.     On February 13, 2018, the Plaintiffs filed individual Charges of Discrimination against Berkeley College, alleging sexual harassment, gender discrimination, and retaliation, with the United States Equal Employment Opportunity Commission ("EEOC").

16.     The Plaintiffs received their Right to Sue letters from the EEOC on or about August 11, 2017.

17.     This lawsuit was initiated within ninety (90) days of the Plaintiffs' receipt of their Right to Sue Letters from the EEOC.

**FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS**

18.     Berkeley College required the Admissions Office at the White Plains campus to be open six (6) days a week, Monday through Thursday, from 9 a.m. until 8 p.m., Fridays from 9 a.m. to 5 p.m. and Saturdays from 9 a.m. to 3 p.m.

19.     Each employee was expected to work evening hours during the regular work week or weekend hours to ensure there was at least one staff member from each division (Adult and High School) was working at the Admissions Office when it was scheduled to be open.

20.     As the Director of Adult Admissions, Mancini managed a team of two admissions counselors, Plaintiff Mekuli and Leslie Carmichael ("Carmichael"). A third counselor, Liliana Ardaix ("Ardaix") joined the team in or about December 2016 and then left her position after a few months because of the harassment she was subjected to by Carmichael and began working in the High School Admissions Division.

21.     During her tenure at Berkeley College, Estevez worked in the High School Admissions Division, first reporting to Lynn Ovimeleh ("Ovimeleh"), who worked as the Director of High School Admissions for Berkeley College's White Plains campus until in or about April 2017, then to David Bertone ("Bertone"), who at all relevant times worked as Associate Vice President of Admissions.

22.     Employees from both Adult Admissions and High School Admissions Division were expected to staff the Admissions Office during the hours it was open and provide information and other assistance to any student, prospective student, or family member of a student or prospective student inquiring by telephone, e-mail or in person.

23.     Mekuli often worked Saturdays during her tenure at Berkeley College. When she worked on a Saturday, she was generally not scheduled to work on the Friday before.

24.     Mekuli liked having a work schedule that permitted her to have Fridays off because she has young children who have extra-curricular activities on Fridays, and if she was not working on a Friday, she would accompany them to these activities.

25.     At all relevant times, Berkeley College had a flexible schedule policy, which allowed employees to take paid time off in full and half-day increments if approved by a manager in advance.

26.     During her employment at Berkeley College, when Mekuli's children had a half-day at school, or a school event she wanted to attend during the day, she would use the flexible schedule policy to take time-off if her supervisor, Mancini, approved the request.

27.     At all relevant times, Berkeley College had a maternity leave policy, which allowed employees to take time off from work to care for newborns.

28.     During her employment at Berkeley College, Mancini made use of the maternity leave policy in 2017 when she gave birth to her first child and took twelve (12) weeks off from work to care for her newborn

29.     Carmichael, who worked as the other admissions counselor in the Adult Admissions Division and who was Mancini's subordinate, is, upon information and belief, a woman who has two independent teenage-age daughters.

30.     Upon information and belief, Carmichael has never taken maternity leave or requested time off for issues relating to child care while working for Berkeley College.

31.     Both before and after Mancini returned from maternity leave in March 2017, Carmichael complained it was "unfair" that Mancini scheduled her to work on Wednesday evenings because she had to work by herself.

32.     Although Mekuli worked most Saturdays by herself, and Mancini often worked evenings alone to ensure that the Admissions Office was staffed at all times, after Carmichael complained, Mancini worked Wednesday evenings along with her, and maintained that schedule until Mancini was illegally fired by Defendants.

33.     In addition to complaining about having to do her fair share of office hours, Carmichael engaged in other problematic conduct that affected the Plaintiffs.

34.     For example, Carmichael routinely refused to provide assistance to a potential student unless she could claim credit for enrolling that student, which enabled her to bulk up her recruitment numbers. In fact, the aggressiveness with which Carmichael pursued potential students prompted many parents and students to complain about her behavior.

35.     Although Berkeley College is a for-profit college, employees in the Admissions Department are legally required to provide truthful information to potential students about the cost of the program and about whether the program would accomplish their educational goals.

36.     Mancini observed Carmichael provide inaccurate information to potential students on a regular basis and reported this misconduct to her direct supervisors including, Ted Havelka ("Havelka"), who worked as the Berkeley College White Plains COO until in or about December 2016, and his replacement, Defendant Martinez.

37.     However, as will be described in more detail below, only Havelka disciplined Carmichael for her misconduct whereas Defendant Martinez encouraged it.

38.     Although the work performance of the Admissions Office staff was not supposed to be evaluated by admissions numbers only, Berkeley College managers like Defendant Martinez continually made clear to Admissions Department employees that recruitment numbers were watched and used to assess performance.

39.     During the relevant time period. Berkeley College Admissions staff, including Plaintiffs, received two kinds of performance appraisals each year.

40.     Each Admissions Office employee received quarterly reports, which focused solely on the number of students they each successfully enrolled and their "performance targets," which were set by Berkeley College upper management, not their direct supervisors. These

performance targets were impossible and almost never achieved by anyone in the admissions on any campus of Berkeley College, including White Plains.

41.     Each Admissions Office employee also received annual performance appraisals that were more comprehensive, focused on their individual work performance, and how they each worked as members of the team.

42.     Salary increases, promotions and other employment-related decisions were supposed to be based only on these annual performance reviews. However Admissions Department employees were told by Berkeley College managers like Defendant Martinez if they hit their performance targets, they could be promoted or receive a salary increase.

43.     Carmichael also subjected the Plaintiffs and other women in the Admissions Office to inappropriate gender-related harassment such as unwanted staring, and comments about their clothing, make-up, and physiques.

44.     Carmichael made offensive comments about Mancini, even when Mancini was Carmichael's supervisor. For example, when Mancini was pregnant in 2016, Carmichael constantly talked about how "skinny" she was even though she was pregnant or "how large" Mancini became toward the end of her pregnancy.

45.     On a daily basis, both before and after Mancini was pregnant and came back from maternity leave, Carmichael looked Mancini up and down in a manner that made it clear Carmichael was judging her body, which always made Mancini very uncomfortable.

46.     Carmichael also made offensive comments about Estevez. Whenever Estevez came to work wearing pants with a lean cut, Carmichael would talk about how good Estevez's body looked in the pants and what a wonderful figure she has.

47.     On a regular basis, Carmichael would call attention to some aspect of Estevez's body, noting how trim and perfect her figure was, often in graphic detail.

48.     Carmichael made these comments about Estevez's body while staring at her in a way that made Estevez feel self-conscious and uncomfortable.

49.     Carmichael's comments were so graphic and her demeanor so intense and unprofessional that the Plaintiffs often felt that her conduct crossed a line from regular office banter to misbehavior that was inappropriate and upsetting.

50.     For example, Carmichael would admire Mancini's hair and talk about how young and beautiful she was at least once a week.

51.     Carmichael would stare at Mekuli and tell her over and over again how good and sexy she looked in this certain shade of red lipstick that she would wear to work.

52.     Carmichael's behavior was so off-putting that Mekuli began to stop wearing her hair down and lipstick to work altogether, to avoid those interactions with Carmichael, which greatly upset her.

53.     In or about November 2016, Mancini issued to Carmichael a corrective action because of unprofessional conduct.  Specifically, Carmichael was reprimanded her badgering behavior on calls with students, providing misinformation to students, and her aggressive behavior and defensiveness when she engaged with her co-workers and supervisors.

54.     Carmichael's corrective action has been approved by then-White Plains COO Havelka ("Havelka"), and his then-supervisor, Michael Russo ("Russo"), then the Associate Vice President of Adult Admissions.

55.     Despite issuance of the corrective action, in or about December 2016, before Mancini left for maternity leave, Havelka and Mancini agreed to give Carmichael more time to improve and decided not to terminate her employment, as they had discussed.

56.     While Mancini was on maternity leave, Mekuli assumed her responsibilities as the Interim Director of the Adult Admissions Department.

57.     During the same time period, Defendant Martinez replaced Havelka as White Plains COO and Gretchen Orsini ("Orsini") replaced Russo as Associate Vice President of Adult Admissions.

58.     Before Mancini left for maternity leave, Martinez told her that when she came back she would be his "right hand" person.

59.     At first Mancini believed Defendant Martinez because he asked her opinion of all Admissions staff members and probed her for information about other departments on the White Plains Campus. Martinez made Mancini feel like a valued member of his management team.

60.     At that time, Mancini specifically informed Martinez about corrective action that had been issued to Carmichael. Martinez told Mancini he agreed with her assessment of Carmichael's misconduct and that it would be Mancini's decision to terminate Carmichael's employment if Carmichael did not improve.

61.     However, within weeks of Mancini's departure, Martinez offered her position to Mekuli, telling Mekuli that children and a career were incompatible and that Mancini would not be able to perform her job with a baby.

62.     Martinez made these comments about Mancini and the alleged incompatibility of work and motherhood in front of the entire Admissions Office staff.

63.     Soon thereafter, Daniel Lapan ("Lapan"), a male admissions counselor in the High School Admissions Division who, upon information and belief, is not a parent with child care responsibilities, started to make negative comments about Mekuli's work schedule on a regular basis, which suggested that Lapan believed Mekuli did not work as much or as hard as he did, because she is a parent.

64.     For example, Lapan would often comment to Mekuli: "You're never here" or "You're leaving early again!" even though she regularly started her work day hours before Lapan arrived at the office. Moreover, because Mekuli worked Saturdays on a regular basis, she was often at work when Lapan was not and he had no idea what she accomplished in any work day.

65.     Martinez's misconduct affected the work environment for the Plaintiffs in other ways.  For example, after he became White Plains COO, Martinez came into the Admissions Office at least once a day and every time he came to the office, Martinez would speak to Estevez in Spanish, telling her jokes and making comments in an effort to make her laugh.

66.     Martinez's flirtatious demeanor suggested that he was interested in Estevez romantically, which made her feel very uncomfortable.

67.     Estevez did not encourage this attention from Martinez. Although she was friendly, Estevez made it clear that she was not interested in any kind of personal relationship with Martinez.

68.     Martinez also engaged in other efforts to have a personal relationship with the Plaintiffs. Martinez often encouraged the Plaintiffs and other employees in the Admissions Office to join him for drinks after work.

69.     However, only Lapan agreed to go out drinking with Martinez after work.

70.     Lapan, who at that time was a non-supervisory employee, also joined Martinez were and  Jose Tavares ("Tavares"), a Berkeley College trustee, for long lunches that, upon information and belief, involved drinking alcohol.

71.     Once Lapan and Martinez starting going out together for drinks on a regular basis, Lapan's demeanor changed and he started to act like he was the director of the department instead of Ovimeleh, which Defendant Martinez allowed and encouraged.

72.     For example, Martinez allowed Lapan to sit in an office alone, while the other Admissions employees from both divisions (adult and high school, including Mancini), had to sit in cubicles in the "bullpen."

73.     Lapan also began to ignore specific directives from Ovimeleh and act like he held her job. For example, at a work event in August 2017, Lapan asked Mekuli if she would work for the High School Admissions team. When Mekuli said no, Lapan told her to "think about it or you will regret it" and also said he would speak with Defendant Martinez and make the "salary happen" for her even though he had no authority to be discuss these matters with her at the time.

74.     Martinez openly condoned Lapan's misconduct by involving Lapan in meetings normally open only to managers both before and after Ovimeleh stepped down from her position as Director of High School Admissions.

75.     In comparison, Martinez failed to include Estevez, the Assistant Director, in manager-meetings to which Lapan was invited, despite her complaints to Martinez and Bertone about being excluded from management meetings, which went unanswered.

76.     Upon information and belief, as a result of Lapan's misconduct and Martinez's condonation of it, Ovimeleh ultimately resigned her position as Director of High School Admissions and began working as an associate under Mancini in the Adult Admissions Division.

77.     Throughout Mancini's maternity leave, Martinez continually claimed: "Deanna's not coming back, and even if she does, she isn't going to be the same after the baby."

78.     At some point, Martinez offered Mancini's job to Mekuli. Martinez told Mekuli that that was "too soft-spoken," she needed to be "aggressive" and she should "fight" to get the promotion.

79.     When Mekuli turned down Martinez's offer, he criticized her for being "too motherly" and "too nurturing," comments he routinely made about her after Mekuli told him she did not want Mancini's job because she knew her old boss would come back from maternity leave as she said she intended to do.

80.     During Martinez's tenure as COO of the White Plains campus, while Mancini was on maternity leave, Martinez continued to suggest that Mancini was unfit for her job, even after Mekuli rejected his offer to her of Mancini's position.

81.     Martinez even suggested at one point to Mekuli that Mancini and Havelka had a romantic relationship because otherwise, Martinez alleged, Havelka would never have promoted Mancini to her position as Director of Adult Admissions.

82.     Martinez also said that in his view, promotions should be based on numbers only and that directors should have the highest number of students enrolled.

83.     As soon as Mancini returned from maternity leave in March of 2017, Martinez and Orsini issued baseless criticism of her work performance and otherwise failed to support her as a managerial employee, even when she asked for their help.

84.     For example, a few days after Mancini returned to work from maternity leave, she asked Carmichael to assist a student who was coming in for a meeting but whom Mancini could not meet with because she was required elsewhere.

85.     Mancini sent the request to Carmichael by e-mail and watched Carmichael print out the e-mail, storm out of the office, and run down in the direction of Martinez's office.

86.     One day later, Martinez invited Mekuli to a meeting with Orsini, the Associate Vice President of Adult Admissions.

87.     At that meeting Martinez and Orsini informed Mekuli that she would continue to oversee Mancini's team, although no one informed Mekuli of her specific duties in this role and whether she was supposed to work with Mancini or not.

88.     Thereafter, Martinez and Orsini informed Mancini that she would no longer supervise Carmichael and that from that point going forward, Mekuli would be Carmichael's supervisor. To rationalize this decision, Martinez told Mancini, "Leslie [Carmichael] really hits her numbers when she has her mind right," but Martinez wrongly claimed that when Mancini supervises Carmichael, she  allegedly became upset and that affected her productivity.

89.     During that conversation, Martinez also told Mancini that the misconduct Carmichael engaged in, which required her to be issued corrective actions in the past, was allegedly not observed while Mancini was on maternity leave.

90.     However, Martinez was not right. During Mancini's maternity leave, Carmichael harassed Ardaix, a woman, who was hired to work as an admissions counselor in the Adult Division. Orisini agreed to transfer Ardaix to the High School Division so that she could avoid having to interact with Carmichael after Mekuli brought the situation to Orsini's attention as Interim Director.

91.     Upon information and belief, Martinez was aware of this situation with Ardaix when he wrongly informed Mancini that Carmichael had engaged in no misconduct while Mancini was on maternity leave.

92.     Despite the fact that Carmichael no longer report directly to Mancini, she continued to engage in misconduct by making inappropriate comments about the physical appearance of Mancini, the other Plaintiffs, and other women in the Admissions Office.

93.     Although Martinez and Orsini told Mekuli she would manage the Adult Admissions division, in reality, Mancini returned to her regular work duties when she returned from maternity leave and Mekuli resumed her regular duties as an associate.

94.     However, Martinez continued to undermine Mancini.

95.     At one point, Martinez told Carmichael that she did not have to report to Mancini anymore after Carmichael alleged that Mancini "got in my face" when Mancini attempted to provide guidance to Carmichael on appropriate conduct with potential students.

96.     During the summer of 2017, Estevez complained to Bertone about Carmichael's harassment.

97.     Estevez also complained about Lapan's insubordination because Lapan was now refusing to follow her directives.

98.     Shortly after complaining, Martinez retaliated against Estevez by changing her work schedule, which he knew would affect Estevez's ability to work her long-held second job as a child care giver.

99.     During the summer months in 2017, Estevez, Mekuli, and Mancini individually met with Orsini and Martinez on numerous occasions to discuss Carmichael's inappropriate comments in general and her unwillingness to work with them as a respectful team member.

100.    Neither Defendant Martinez nor Orsini made any effort to remediate the hostile work environment Carmichael subjected the Plaintiffs to.

101.    Indeed, during one meeting, Orsini claimed she had obtained video footage of the Plaintiffs talking in the Berkeley College parking lot, which, Orsini alleged, demonstrated that we were "gossiping" about Carmichael, which the Plaintiffs told her was not true, but Orsini ignored them.

102.    After the meeting during which Orsini claimed that the Plaintiffs were gossiping about Carmichael, Mancini contacted Berkeley College's human resources manager, Clarissa Gilliam ("Gilliam") to complain about Carmichael's misconduct and the way in which Orsini and Martinez failed to remedy it.

103.    In an e-mail sent on or about July 6, 2017, Mancini specifically told Gilliam that "I'm writing to you because I don't know what my options are, or what the outcome of this situation will be . . . it's become a toxic work environment."

104.    Gilliam offered to meet with Mancini. They set a date and time, but when the meeting day arrived, Mancini did not meet with Gilliam about her complaint.

105.    Instead, Mancini was called into a meeting with Gilliam, Martinez, and Orsini, and asked to sign a performance improvement plan ("PIP"). Mancini was then told she could speak freely to Gilliam.

106.    Mancini did not feel comfortable, because it was evident her managers already knew she complained, and they were retaliating against her for complaining by issuing the PIP.

107.    At that meeting, Martinez falsely told Mancini that he would make everyone in the Admissions Department sign a PIP and that he would use the documents to fire Carmichael.

108.    Martinez also falsely assured Mancini that her PIP "didn't matter" and she had to sign it because "everyone has to, to be fair" and it "wouldn't look right" if she did not sign the document.

109.    Martinez told Mancini "not to worry" about the PIP, and even though she did not feel she deserved it, she followed Martinez's directive and signed the Performance Improvement Plan because she felt she had no choice.

110.    In response to Estevez's complaints regarding Carmichael's harassment and Lapan's misconduct, on or about July 12, 2017, Bertone directed Estevez to sign a PIP.

111.    Although Estevez did not agree that her performance was deficient, she signed the PIP because she felt she had no choice and would be fired if she refused.

112.    Mekuli was also put on a PIP the same day. Although Mancini was present for the presentation of the PIP to Mekuli, as her direct supervisor she had no knowledge of this action prior to the event and did not agree with this employment action.

113.    At the end of the same day all the Plaintiffs were issued retaliatory PIPs, the entire Admissions Office team was called into a conference room and told by Orsini that the "nonsense" regarding Carmichael had to come to an end and she said she refused to come back to this campus and discuss "these issues" again.

114.    Less than one month later, in or about September 2017, Mancini was called into a meeting with Berkeley College's human resources representative, Gilliam, and Orsini.

115.    At that meeting, Orsini informed Mancini that her employment was terminated.

116.    When Mancini asked why she was being fired, Orsini said to her: "Deanna a decision has been made, and we no longer need your services. We have decided to terminate your position."

117.    When Orsini left the room, Mancini asked Gilliam why she was being fired and she said one word: "Performance." When Mancini asked if she could speak with Orsini and

Martinez so she could better understand the reason for her termination of employment, Gilliam said, "No."

118.    That same day, Estevez was called into a meeting with Gilliam and Orsini, and Gilliam informed her that her employment was terminated.

119.    When she asked why she was being fired, the only explanation Gilliam provided was that she was being fired for her alleged "performance," with no elaboration or examples.

120.    That same day, Mekuli was also dismissed for alleged performance deficiencies. Orsini said to Mekuli "Diane we no longer need your services." Mekuli asked Gilliam what that meant and Gilliam told her this decision was based on her alleged deficient performance.

121.    After the Plaintiffs were illegally fired for complaining about Carmichael's harassing conduct, Martinez contacted Estevez via text, and in Spanish, asked her out for drinks.

122.    Martinez also commented that if Estevez had stayed employed at Berkeley College, she would have gotten him "in trouble."

123.    Upon information and belief, Martinez is currently married to a woman he used to supervise at Berkeley College when she worked there.

124.    After the Plaintiffs were illegally fired, Martinez was promoted to a Vice President position.

125.    Martinez also promoted Lapan to take the newly created position  of Director of Adult and High School Admissions.

126.    Upon information and belief, a man was hired to replace Mekuli.

127.    Currently, the only woman admissions counselor remaining at the White Plains campus is Carmichael.

128.    As a result of the illegal discrimination and retaliation described herein, the Plaintiffs have sustained significant economic and emotional damage.

## FIRST CAUSE OF ACTION

**Gender Discrimination, Including Hostile Work Environment and
Care-Giver Discrimination, in Violation of Title VII Against Berkeley College**

129.    Plaintiffs hereby re-allege and incorporate by reference all allegations in the preceding paragraphs.

130.    At all relevant times to this action, Berkeley College employed Plaintiffs within the meaning of the Title VII.

131.    As alleged herein, Defendant Berkeley College subjected Plaintiffs to a hostile work environment because of their gender, and otherwise discriminated against Plaintiffs because of their gender and status as care-givers.

132.    As alleged herein, Berkeley College's mistreatment of Plaintiffs violated Title VII.

133.    As alleged herein, Berkeley College's illegal conduct proximately caused Plaintiffs' injuries.

## SECOND CAUSE OF ACTION

**Retaliation in Violation of Title VII against Berkeley College**

134.    Plaintiffs hereby re-allege and incorporate by reference all allegations in the preceding paragraphs.

135.    At all relevant times to this action, Berkeley College employed Plaintiffs within the meaning of Title VII.

136.    By retaliating against Plaintiffs for engaging in protected activity when they complained about being sexually harassed by their co-worker, Carmichael, and subject to other

gender-related misconduct by Carmichael, Lapan, and supervisors Martinez, Orsini, and Gilliam, which includes but is not limited to scheduling changes, baseless performance improvement plans, and ultimately their termination of employment because they engaged in protected activity, Defendant Berkeley College violated Title VII.

137.    Plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Berkeley College's illegal practices.

### THIRD CAUSE OF ACTION

**Gender Discrimination, Including Hostile Work Environment and
Care-Giver Discrimination, in Violation of NYSHRL against Berkeley College**

138.    Plaintiffs hereby re-allege and incorporate by reference all allegations in the preceding paragraphs.

139.    At all relevant times to this action, Berkeley College employed Plaintiffs within the meaning of the NYSHRL.

140.    As alleged herein, Defendant Berkeley College subjected Plaintiffs to a hostile work environment because of their gender, and otherwise discriminated against Plaintiffs because of their gender and status as care-givers.

141.    As alleged herein, Berkeley College's mistreatment of Plaintiffs violated NYSHRL.

142.    As alleged herein, Berkeley College's illegal conduct proximately caused Plaintiffs' injuries.

### FOURTH CAUSE OF ACTION

**Retaliation in Violation of NYSHRL against Berkeley College**

143.    Plaintiffs hereby re-allege and incorporate by reference all allegations in the preceding paragraphs.

144.    At all relevant times to this action, Berkeley College employed Plaintiffs within the meaning of NYSHRL.

145.    By retaliating against Plaintiffs for engaging in protected activity when they complained about being sexually harassed by their co-worker, Carmichael, and subject to other gender-related misconduct by Carmichael, Lapan, and supervisors Martinez, Orsini, and Gilliam,  which includes but is not limited to scheduling changes, baseless performance improvement plans, and ultimately their termination of employment because they engaged in protected activity, Defendant Berkeley College violated NYSHRL.

146.    Plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Berkeley College's  illegal practices.

## FIFTH CAUSE OF ACTION

### Aiding and Abetting Gender Discrimination and Retaliation
### in Violation of NYSHRL Section 296(6) against Defendant Joel Martinez

147.    Plaintiffs hereby re-allege and incorporate by reference all allegations in the preceding paragraphs.

148.    By engaging in the illegal mistreatment of Plaintiffs as described herein, Defendant Martinez aided and abetted discrimination based on gender, and retaliation, in violation of NYSHRL, Section 296(6).

149.    As a result, Plaintiffs have suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional damages, humiliation, insult to dignity, and other compensable damages as a result of Defendant Martinez's  illegal practices.

**JURY DEMAND**

150.       Plaintiffs demand trial on all issues triable by a jury.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that this Court grant them injunctive relief to enjoin and permanently restrain Defendants for violating their civil rights under Title VII, and the NYSHRL; declare that the acts and practices complained of herein are in violation of Title VII, and the NYSHRL; render a judgment sufficient to compensate her for economic, emotional and psychic injuries, humiliation, suffering, insult to dignity, and to provide necessary treatment; and to punish Defendants for their violation of law and deter similar violations in the future; grant Plaintiff such interest as in permitted by law; attorneys' fees and all other costs associated with bringing this action against Defendants; and, all such additional relief as this Court may deem just and appropriate under the circumstances.

Dated: November 7, 2018

Respectfully submitted,

LAW OFFICE OF DANIELA NANAU P.C.

_____
DANIELA NANAU

89-03 Rutledge Avenue
Glendale, New York  11385
Telephone: (888) 404-4975
Facsimile: (718) 998-6916
E-Mail: dn@danielananau.com

ATTORNEYS FOR PLAINTIFFS