UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
JIMARZARETTE ESTEVEZ, DEANNA
MANCINI, and DIANE MEKULI,

                            Plaintiffs,

     - against -

BERKELEY COLLEGE, JOEL MARTINEZ,
GRETCHEN ORSINI, and DAVID BERTONE,

                          Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 18-CV-10350 (CS)

<u>Appearances</u>:

Daniela Nanau
Law Office of Daniela Nanau P.C.
Glendale, New York
*Counsel for Plaintiffs*

Bran C. Noonan
Mohammad Shihabi
FordHarrison LLP
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

     Before the Court is the motion for summary judgment of Defendants Berkeley College,

Joel Martinez, Gretchen Orsini, and David Bertone.  (Doc. 68.)  For the following reasons, the

motion is GRANTED.

## I.    **BACKGROUND**

     This case arises out of the alleged sex-based discrimination and retaliatory termination

that Plaintiffs Jimarzarette Estevez, Deanna Mancini, and Diane Mekuli claimed to have

experienced at their former workplace, Berkeley College.

A.    **Facts**

The following facts are based on the parties' Local Civil Rule 56.1 Statements,

responsive 56.1 Statements, and supporting materials, and are undisputed except as noted.

Berkeley College is a regionally accredited university in New York.  (Doc. 88 ("Ps' 56.1

Resp.") ¶ 1.)  Plaintiffs Jimarzarette Estevez, Deanna Mancini, and Diane Mekuli worked in the

admissions department for Berkeley's White Plains campus.  (*See id.* ¶¶ 13, 16-17.)[1]  The

admissions department was divided into high school admissions and adult admissions, each of

which generally had its own directors and assistant directors.  (*Id.* ¶¶ 4-5.)

1.    **Plaintiffs' 2014 Performance Improvement Plans**

In the summer of 2014, high school admissions was supervised by Director of

Admissions Lynn Ovimeleh (who reported to Associate Vice President of Admissions for High

School David Bertone), and adult admissions, which had no director or assistant director, was

supervised by White Plains Campus Operating Officer ("COO") Ted Havelka.  (*Id.* ¶¶ 16, 22-

24.)[2]  At that time, Estevez was an associate in high school admissions and Mancini and Mekuli

---

[1] In their responsive 56.1 Statement, Plaintiffs dispute that Berkeley has a campus in
White Plains and instead insist that the "campus" is merely a commercial building that contains a
dormitory, administrative offices, and classrooms.  (Ps' 56.1 Resp. ¶ 2.)  For lack of a better
word, because the distinction is immaterial, and because Plaintiffs themselves refer to the
location as "the White Plains campus," (*e.g.*, *id.* ¶ 24; Doc. 87 ("Ps' Opp.") at 11), the Court will
use the term "campus" to describe Plaintiffs' workplace.

This type of dispute recurs throughout Plaintiffs' responsive 56.1 Statement, wherein
Plaintiffs repeatedly "denominate a dispute over an issue of fact [that] largely consists of a
dispute over the characterization of certain basic facts and over other extraneous issues."
*B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05-CV-9988, 2009 WL 3076042, at *1 n.2 (S.D.N.Y.
Sept. 28, 2009).  "When no assertion contradicting a basic fact is presented in a party's opposing
56.1 statement, the Court has taken that basic fact as undisputed."  *Id.*

[2] Plaintiffs dispute Havelka's position and assert that he worked as COO *and* director of
adult admissions, but the portion of the record that Plaintiffs cite does not support this
proposition.  (*See* Ps' 56.1 Resp. ¶¶ 19, 23; Doc. 73 ("Nanau Decl.") Ex. 7 at 42:17-25.)

were associates in adult admissions.  (*Id.* ¶ 27.)  Although they worked in different departments,

Plaintiffs and other admissions associates generally all worked in the same open bullpen office.

(*Id.* ¶ 25.)

In June 2014, Plaintiffs' respective supervisors issued each Plaintiff a performance

improvement plan ("PIP"), also known as a corrective action plan.  (*Id.* ¶¶ 28-30; *see id.* ¶ 12.)

The PIPs "identified several areas where [Plaintiffs'] performance needs improvement or is

unsatisfactory."  (Doc. 69-1 ("Noonan Decl.") Exs. B-D.)  Specifically, Plaintiffs had not met the

minimum expected weekly average number of daily calls, interviews, and applications for the

quarter.  (*Id.* Exs. B-D.)[3]  The PIPs warned that failure to meet these objectives "will result in

further corrective action up to and including termination of employment."  (*Id.*)  Mancini asked a

colleague if she should be concerned about the PIP, and the colleague told her that "it was not

---

This is one of several examples where Plaintiffs dispute a fact but cite to a part of the
record that does not raise a dispute.  Responses that "do not point to any evidence in the record
that may create a genuine issue of material fact[] do not function as denials, and will be deemed
admissions of the stated fact."  *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)
(cleaned up); *see Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y.
2011) (disregarding plaintiff's responses where plaintiff failed to specifically dispute defendant's
statements).  It is not the job of a district court judge to sift through the entire record or even
entire documents in search of a fact dispute.  Because inadequate responses like this one (among
others) do not meet the burden under Rule 56(c) to cite particularized evidence showing a
genuine dispute, the Court deems the corresponding facts admitted.  *See, e.g.*, *Monahan v. N.Y.C.
Dep't of Corr.*, 214 F.3d 275, 291-92 (2d Cir. 2000) (affirming district court's grant of motion
for summary judgment for defendants where plaintiffs' counterstatement failed to set forth
particularized evidence showing a triable issue); *Johnson v. City of N.Y.*, No. 10-CV-6294, 2012
WL 1076008, at *3 (S.D.N.Y. Mar. 28, 2012) (court is not obligated "'to perform an independent
review of the record to find proof of a factual dispute'") (quoting *Amnesty Am. v. Town of West
Hartford*, 361 F.3d 113, 121 (2d Cir. 2004)).

[3] Berkeley is a for-profit institution, (*e.g.*, Doc. 34 ¶ 12), and its admissions personnel
appear to be more like salespeople, with goals or quotas for contacts and closed deals, than like
traditional college admissions officers who provide information to applicants and screen for the
most qualified ones.

something to get worked up about because everyone received them at one point or another." (*Id.* Ex. HH at 53:22-54:4.)

## 2.     Plaintiffs' Problems with Leslie Carmichael

In September 2014, Havelka hired Leslie Carmichael as an associate in adult admissions. (Ps' 56.1 Resp. ¶ 31.)  In February 2015, Mancini was promoted to assistant director of adult admissions and began overseeing Carmichael and Mekuli.  (*Id.* ¶¶ 34-35.)  Although her new position came with managerial responsibilities, such as providing feedback to associates and attending annual reviews, Mancini still had goals for daily calls, interviews, and applications. (*Id.* ¶¶ 36-38.)

Beginning sometime in 2015 or 2016 (the record is not clear, but the precise timing is immaterial), Mancini observed that Carmichael was exhibiting problematic behavior, including the following:  repeatedly calling students, not documenting her work appropriately, becoming possessive over students, being overly demanding with administrative assistants, not focusing on tasks because she was concerned over other associates' performance, questioning Mancini repeatedly on policies or procedures, asking Mancini to talk to students for her because Mancini was "more convincing" and "prettier" than she, and feigning ignorance so that Mancini would help her or do her work for her.  (*See* Noonan Decl. Ex. HH at 141:5-147:4.)  Mancini also observed that when Carmichael got angry, she would engage in odd, passive-aggressive behavior, such as the following:  not speaking and instead communicating by email only; not saying hello or goodbye; stomping out of the office so fast that she would trip over her own feet; gawking and staring at her co-workers; asking repetitive questions to the point where it was badgering; giving backhanded compliments; and ripping up papers, throwing them in the garbage, and then taking the garbage home in her purse.  (*See id.* Ex. HH at 177:4-187:20.)

Carmichael would also make comments about her co-workers' appearance.  When Mancini was pregnant, Carmichael initially commented that Mancini did not "look pregnant at all." (*Id.* Ex. HH at 263:24-264:2.)  Later on, Carmichael would comment that Mancini looked "huge" but that her legs looked "skinny" even though she was pregnant, and that she looked "great" in a dress.  (*Id.* Ex. HH at 181:25-182:13.)  And when Mancini returned from maternity leave, Carmichael commented that Mancini looked "thin" in a dress, like she needed to eat, and that she did not look like she had "been pregnant at all." (*Id.* Ex. HH at 264:13-23.)

Carmichael would tell Mekuli how "thin" she was and tell her that she was "very, very attractive" and that her lipstick looked beautiful on her.  (*Id.* Ex. II at 178:2-5, 178:17-18.)  Mekuli testified that she would avoid wearing certain dresses and wore her hair up to avoid drawing comments from Carmichael.  (*Id.* Ex. II at 178:5-14.)  As with Mancini, Carmichael would ask Mekuli to do tasks in her stead because Mekuli was "prettier" and "more appealing" than she.  (*Id.* Ex. II at 179:15-19.)

Carmichael would tell Estevez how "skinny," "pretty," "little," and "petite" she was, and remarked "how tan" Estevez was when she returned from vacation.  (*Id.* Ex. JJ at 156:12-25.)  Estevez recalled that she wore yoga pants to work on one occasion and Carmichael, with her mouth agape and eyes wide open, remarked that Estevez looked "so beautiful" and "so skinny," and Carmichael said, "Look at that body on you, Jimar."  (Nanau Decl. Ex. 9 at 153:10-21.)

According to Havelka, Carmichael would also make comments about his physical appearance; for example, Carmichael said that he "looked really good in his jeans and sweater." (Ps' 56.1 Resp. ¶¶ 80-81.)  According to Bertone, Carmichael commented on his physical appearance on numerous occasions.  (*Id.* ¶ 82.)  For example, she would say that he "looked good" in a suit or that she liked his shirt or the color of his tie.  (*Id.* ¶ 83.)  She would also

compliment Bertone on his tan and tell him that he had lost weight and "looked good." (*Id.* ¶ 84.)

Mekuli told her supervisor, Ovimeleh, that Carmichael's staring made her feel uncomfortable. (Nanau Decl. Ex. 5 at 65:5-10.) Similarly, Havelka received complaints about Carmichael's behavior, including her inappropriate comments about people's dress or physical appearance, from Mancini and other staff. (*Id.* Ex. 7 at 14:25-17:5.)

On November 7, 2016, Havelka and Mancini met with Carmichael and presented her with a PIP. (Ps' 56.1 Resp. ¶ 59.) The feedback in the PIP included the following: Carmichael's response to feedback, requests, and reminders had been unprofessional; Carmichael was overcalling students; Carmichael felt the need to "communicate details that are not relevant, and at times that are not convenient to the other party"; and Carmichael was distracting others by, for example, speaking to multiple staff members on multiple occasions when the admissions department recruited a student. (Noonan Decl. Ex. J.) The PIP also set performance expectations, noting that "[a]ll associates are to maintain professionalism at all times," including when "receiving feedback and/or communicating with others (internal/external)." (*Id.*) It also advised Carmichael to "[r]efrain from 'side-bar' conversations" and to bring concerns to Mancini and then Havelka rather than "[r]epeating a series of events to multiple staff members." (*Id.*) The PIP did not mention Carmichael staring at co-workers or making comments about their physical appearance. (*Id.*; Ps' 56.1 Resp. ¶ 62.)

### 3.     Leadership Reorganization at White Plains

In November 2016, Mancini was promoted to director of adult admissions. (Ps' 56.1 Resp. ¶ 49.) Then, in December 2016 and January 2017, Berkeley reorganized its leadership

structure at White Plains.  (Doc. 69-6 ("Orsini Decl.") ¶ 4.)[4]  Associate Vice President of
Admissions for Adult Gretchen Orsini was assigned to supervise White Plains' adult admissions
department, (*id.* ¶ 5),[5] Havelka was transferred to Berkeley's New York City campus, and Joel
Martinez replaced Havelka as COO of the White Plains Campus, (Ps' 56.1 Resp. ¶ 92).  Bertone
remained associate vice president of admissions for high school at White Plains, and Ovimeleh
was still the director of high school admissions.  (*Id.* ¶ 94.)

Mancini went on maternity leave on December 30, 2016.  (*Id.* ¶ 96.)  Before she left, she
sent an email on December 27 to Clarissa Gilliam (who worked in human resources), copying
Havelka, Martinez, and Orsini.  (*Id.* ¶ 97.)  This email was an update about Carmichael's
behavior since her November 7 PIP, and it included two forwarded emails about an incident on
November 16.  (Noonan Decl. Ex. M.)  In short, Carmichael was asked to give a student a tour,
Carmichael was reluctant to help, and she sent another associate to give the tour instead.  (*Id.*)
Mancini told Carmichael that she needed to communicate clearly with her teammates, take

---

[4] Plaintiffs dispute this fact based on the testimony of Associate Vice President of
Admissions for Adult Gretchen Orsini that "restructuring occurred at Berkeley College on a
regular basis and generally occurred in September or October."  (Ps' 56.1 Resp. ¶ 89.)  Their cite
to Orsini's deposition that supposedly supports this proposition, however, is only partially in the
record (they cite pages 132:23-133:2, but page 133 is not included in either parties' exhibits).
(*See id.*)  The portion that is in the record reflects that Orsini did not "remember exactly" when
she was reassigned to White Plains and that it occurred "[s]omewhere around September."
(Nanau Decl. Ex. 16 at 132:19-22.)  That testimony does not conflict with her sworn declaration
that the reorganization occurred in December 2016 and January 2017.  (*See* Orsini Decl. ¶ 4.)
Again, Plaintiffs appear to dispute this fact merely for the sake of disputing it and not out of a
sincere belief that it is disputed, as evidenced by their opposition memorandum, in which
Plaintiffs state that "in early 2017, the White Plains location underwent a management
overhaul."  (Ps' Opp. at 2.)  The timing of the reorganization is not material to the outcome of
the case, but knowing that it occurred at the end of 2016 and the beginning of 2017 (rather than
in September or October 2016) is helpful to understand the series of events that follow.

[5] Plaintiffs dispute this fact, citing to the same truncated portion of Orsini's deposition as
note 4, above, which does not raise a dispute as to Orsini's position.  (*See* Ps' 56.1 Resp. ¶ 91.)

initiative to timely assist students, not focus on irrelevant and extraneous details, and talk to Mancini if she is uncomfortable or unsure how to handle a situation. (*See id.*) In her email to Gilliam, Mancini wrote that she had not needed to address this type of behavior with Carmichael since the day after the November 16 incident, but that she had heard from others that Carmichael had recently refused to help a high school student over the phone (Carmichael works in adult admissions) and did not take a message. (*See id.*) Mancini wrote that Carmichael's "reluctance to help students when it does not directly benefit her personal productivity[] is a recurring theme." (*Id.*) She also noted that she had asked Martinez to oversee Carmichael's corrective action plan, and that if Carmichael continued "this type of behavior," Mancini would support Carmichael's termination. (*Id.*) Nothing in the email mentioned Carmichael making comments regarding her co-workers' physical appearance. (Ps' 56.1 Resp. ¶ 100.)

Before sending the December 27 email, Mancini had spoken to Martinez in person. (*Id.* ¶ 101.) Mancini told Martinez that Carmichael "had a corrective action plan, and that if he saw any of the behavior outlined in the corrective action plan or if he received complaints from other admissions associates, [Mancini] would support [Carmichael's] termination." (Noonan Decl. Ex. HH at 316:13-25.) Mancini did not tell Martinez that Carmichael made any comments about her or anyone else's physical appearance. (*Id.* Ex. HH at 317:2-16.)[6]

---

[6] Plaintiffs dispute this fact, but the portion of the record that they cite (a quote from Mancini's deposition that if Martinez "saw any of the behavior outlined in the corrective action plan or if he received complaints from other admissions associates, [Mancini] would support [Carmichael's] termination") does not raise a dispute as to this fact. (*See* Ps' 56.1 Resp. ¶¶ 101-102.) Although Mancini testified that she told Martinez about Carmichael's "behavior," (Noonan Decl. Ex. HH at 315:21-316:4), Mancini specifically testified that she did not tell Martinez that Carmichael had made comments about her or other people's physical appearance, (*id.* Ex. HH at 317:2-16).

### 4.       Plaintiffs' Problems with Daniel Lapan and Joel Martinez

In January 2017, Estevez was promoted to assistant director of high school admissions. (Ps' 56.1 Resp. ¶ 115.)  In her new position, she began supervising Daniel Lapan, who had been hired in March 2015 as an associate in high school admissions.  (*See id.* ¶ 105.)  Lapan was a family friend of a member of Berkeley's board of trustees.  (*Id.*)

Shortly after he had started in 2015, Lapan took it upon himself to move out of the bullpen, where the other associates worked, and into some empty office space.  (*See* Noonan Decl. Ex. JJ at 145:20-146:7; *id.* Ex. HH at 395:4-13; *id.* Ex. MM at 40:16-41:10; Nanau Decl. Ex. 4 at 55:22-56:7; *id.* Ex. 5 at 23:20-25:14.)  According to Ovimeleh, his supervisor at the time, Lapan said that he could not concentrate in the bullpen because there was too much noise and that he needed to work by himself.  (Nanau Decl. Ex. 5 at 24:10-16.)  Ovimeleh brought this to the attention of her supervisor, Bertone, who told her that this was "unacceptable" and that Lapan had to sit in the bullpen with the other associates.  (*Id.* Ex. 5 at 24:22-25.)  Lapan was adamant that he could not work in the bullpen and became unhappy; eventually, Bertone relented and said that if it made Lapan happy and Lapan felt he could perform better in a different room, he could do so.  (*Id.* Ex. 5 at 24:25-25:7.)

Lapan also said that there was "too much estrogen" in the bullpen.  (*Id.* Ex. 5 at 25:15-22.)  According to Ovimeleh, he made this comment "to everybody."  (*Id.*)  Mekuli testified that she heard Lapan say it twice – once shortly after he started and again in May or June of 2017. (Noonan Decl. Ex. II at 250:2-21.)  According to Estevez, Lapan made this comment "constantly."  (*Id.* Ex. JJ at 146:8-12.)  She could not recall whether he said it in 2015, but she believes he said it "multiple times" or "quite often" in 2016, perhaps more than thirty times.  (*Id.* Ex. JJ at 146:13-147:25.)

Despite this, Estevez and Lapan had a "healthy relationship" prior to her promotion in 2017, *i.e.*, they performed well together and used to talk at work.  (Ps' 56.1 Resp. ¶ 107; Noonan Decl. Ex. JJ at 138:14-139:9.)  They also interacted outside of work.  For example, Lapan attended Estevez's wedding in 2015, Estevez asked Lapan for a ride to the train in July 2015, and they had dinner or drinks together with Mekuli on one occasion.  (Ps' 56.1 Resp. ¶¶ 108-109; Noonan Decl. Ex. N at D003108; *id.* Ex. II at 251:15-21; Nanau Decl. Ex. 9 at 39:12-40:4.)  In September 2016, Estevez and Lapan discussed driving together to meet Mekuli and her boyfriend.  (Noonan Decl. Ex. N at D003144-45.)  In October 2016, Estevez and Lapan made plans to attend a concert together in June 2017.  (*Id.* Ex. N at D003154-55.)  Lapan never ended up going to the concert with Estevez, however, because their relationship "fell apart" before then.  (*Id.* Ex. JJ at 42:13-43:7.)

In April 2017, Ovimeleh stepped down from her position and began working as an associate in adult admissions, which meant that high school admissions no longer had a director. (*Id.* Ex. JJ at 196:2-6, 197:12-14.)[7]  Officially, Estevez now reported directly to Bertone, but Bertone had only been visiting the White Plains campus once a month or once every other month, and by April 2017, he was visiting even less.  (Ps' 56.1 Resp. ¶ 119; Noonan Decl. Ex. JJ at 198:4-199:2.)  According to Estevez, COO Martinez became her "de facto" supervisor on a daily basis.  (Noonan Decl. Ex. JJ at 198:4-199:2.)

Estevez and Martinez would sometimes speak in Spanish, and Martinez would tell Estevez jokes in Spanish.  (Ps' 56.1 Resp. ¶¶ 208-209.)  At her deposition, Estevez could not recall any joke he had made to her, but she testified that "he was probably referring to [their]

---

[7] Plaintiffs dispute Defendants' characterization of Ovimeleh's move but not the underlying fact that she moved departments.  (*See* Ps' 56.1 Resp. ¶ 117.)

culture" or talking about "everyday stuff."  (Noonan Decl. Ex. JJ at 369:19-370:6.)  Estevez

characterized the jokes as a "rude, weird, flirty way to make a connection with [her]."  (*Id.* Ex. JJ

at 369:12-18.)

In April or May 2017, Estevez complained to Bertone about Lapan being insubordinate

by not speaking or listening to her and by stealing her students, and she also complained about

Martinez inviting Lapan to managerial meetings but excluding her, as well as the "hostility" and

"inappropriate work environment" in the admissions office.  (*Id.* Ex. JJ at 204:14-213:12, 360:8-

361:6.)  From April to July, Estevez printed and saved several emails regarding her issues with

Lapan; it is undisputed that none mentions his "too much estrogen" comments or alleges

harassment based on her sex.  (Ps' 56.1 Resp. ¶ 122; *see* Noonan Decl. Ex. P.)

Lapan described Martinez as a "mentor," who had convinced him to stay at Berkeley

when he was considering quitting.  (Nanau Decl. Ex. 17 at 19:6-20:15.)  Estevez felt that

Martinez favored Lapan.  (Ps' 56.1 Resp. ¶ 121.)  Mekuli felt similarly:  she testified that she

believed Martinez wanted to work with males based on the way he interacted with Lapan.

(Noonan Decl. Ex. II at 342:9-16.)  For example, Martinez would let Lapan attend meetings or

events that were not for associates, they went out to lunch three or four times together along with

a board member who Lapan knew, they went out for drinks together after work, and they would

joke with each other and high-five each other.  (*Id.* Ex. II at 342:17-343:22, 344:18-347:25;

Nanau Decl. Ex. 17 at 7:11-17, 17:22-25, 19:6-10.)  Mekuli, however, never complained to

anyone about any issues related to Lapan, including his "too much estrogen" comments.  (Ps'

56.1 Resp. ¶ 114.)

### 5.      Mancini's Problems with Carmichael After Her Return

Mancini returned from maternity leave at the end of March 2017.  (*Id.* ¶ 133.)  While Mancini was on leave, Mekuli had served as interim director of adult admissions.  (*Id.* ¶ 126.)  During this time, Martinez encouraged Mekuli to "try to get" Mancini's position and asked Mekuli whether Mancini would "be able to perform the way she did with the new baby" when she returned.  (Nanau Decl. Ex. 13 at 260:8-23.)  Mekuli declined because the position was filled, she was comfortable where she was, and she had no interest in the position.  (*Id.*)[8]

After Mancini's return, Carmichael "felt that Mancini was picking on her and felt she was being treated differently."  (Ps' 56.1 Resp. ¶ 134.)  Shortly after she returned, Mancini asked Carmichael to assist a student for her while she was in a meeting, and Carmichael became "enraged" and "stormed down the hall" to Martinez's office.  (Noonan Decl. Ex. HH at 346:11-22.)  A few days later, Orsini and Martinez met with Mancini and told her that they thought it would be best if Mekuli (rather than Mancini) managed Carmichael because Carmichael's recruitment numbers had been "fantastic," and Orsini and Martinez had not seen any of the behaviors detailed in Carmichael's PIP while Mancini had been on leave.  (*Id.* Ex. HH at 345:2-347:19.)  Orsini and Martinez met with Mekuli, too, and told her that it would be best if Carmichael reported to her until the end of the April 2017 term.  (Ps' 56.1 Resp. ¶ 137.)

On May 12, 2017, Mancini told Martinez that Carmichael had "been much sweeter" to her on a personal level, but that on a work level it was difficult to manage Carmichael because she did not like feedback.  (*Id.* ¶ 138.)  Mancini did not mention anything about Carmichael commenting on people's physical appearance.  (*Id.*)

---

[8] Plaintiffs include additional paragraphs in their opposition memorandum and 56.1 Counterstatement that are not in the record at the cited location, and the Court has been unable to locate them elsewhere.  (*See* Ps' Opp. at 8; Doc. 89 ("Ps' 56.1 Counterstmt.") ¶ 35.)

On May 31, Mancini told Bertone that Mekuli and Ovimeleh were getting upset because Carmichael was taking students that they had contacted.  (*Id.* ¶ 139; Noonan Decl. Ex. R.) Bertone said that this was "fair game," which Mancini relayed to Ovimeleh the next day, and Mancini acknowledged that Carmichael was "really savvy" and that this was why Carmichael was "doing so well."  (Noonan Decl. Ex. R-S.)

On July 6, 2017, Mancini overheard Carmichael "gossiping" about her in Lapan's office, saying that Mancini "was getting in her face and making things hard for her," and that she would rather report to Mekuli.  (Ps' 56.1 Resp. ¶ 140; Noonan Decl. Ex. HH at 394:7-395:3.)  Mancini emailed Orsini, copying Martinez, and described what she overheard.  (Ps' 56.1 Resp. ¶ 141; Noonan Decl. Ex. T.)  She then wrote,

> To say I am hurt is an understatement. . . .  There is gossip happening and I find it impossible to manage someone who doesn't respect me.
>
> I can't work like this anymore.  There have been SO many conversations and so many attempts to rectify this and yet she still gossips, still feels targeted by me . . . .  I am beside[] myself.  It is becoming apparent that she may never respect me.
>
> To be 100% honest, . . . the two of you telling her she does not have to report to me when I returned from maternity leave has made the strain on the relationship 100x worse.  This office is a different place than how I left it in December.

(Noonan Decl. Ex. T.)

Mancini spoke to Martinez after she sent the email.  (Ps' 56.1 Resp. ¶ 141.)  He suggested meeting with Carmichael, but Mancini did not want to do that, so he suggested emailing her instead.  (*Id.* ¶ 142.)  Mancini did so, copying Orsini and Martinez.  (Noonan Decl. Ex. U.)  She described what she overheard and concluded with the following:  "I'm really disappointed with this behavior.  It is not only unprofessional, but counterproductive to business and incites a toxic work environment.  If you have an issue I prefer you come directly to me to discuss."  (*Id.*)

Mancini then sent a self-described "lengthy" email to Gilliam in human resources,

forwarding the email she sent Carmichael.  (Noonan Decl. Ex. V; Nanau Decl. Ex. 29 at

D003249-52.)  The email contains multiple complaints about Mancini's interactions with

Carmichael since Mancini returned from leave:  she described an incident in which Carmichael

"accidentally text messaged [Mancini] gossip that was meant for a colleague, talking ill about

[Mancini]"; she described Carmichael's "odd behavior," such as calling students behind closed

doors, "gossiping about [Mancini]," "fabricat[ing] blatant lies," and saying that Mancini "was 'in

her face' when in reality, [Mancini] had not spoken to her at all"; she wrote that she was

"reluctant to even attempt to manage [Carmichael], because the aftermath is not worth it" and

described how Carmichael became defensive when given a directive; she wrote that Carmichael

sometimes gave students information that was not compliant or worded correctly but that she did

not correct her to avoid "drama" with Carmichael; she described receiving complaints about

Carmichael "from other staff members on a routine basis" and noted that "everyone has become

complacent, because it is easier"; she also wrote, "There is no motivation, morale has died down,

and it's become a toxic environment"; and she mentioned how she used to love working at

Berkeley but that "it has become exhausting and no longer enjoyable" and that she was "really

disappointed with how this situation has unraveled."  (Noonan Decl. Ex. V.)

In the email, Mancini also described how she felt unsupported by Orsini and Martinez:

she told Gilliam how Orsini and Martinez had arranged for Mekuli to manage Carmichael until

the end of the April term; she described how "everyone in the Admissions office can constantly

feel tension" and wrote that at a team meeting with Orsini and Martinez, they discussed "team

work, team success, working together to reach our common goals, eliminating gossip, toxic work

environment, etc."; she relayed how Orsini and Martinez did not see the need for Carmichael to

be on a corrective action plan, how their experiences with Carmichael had been positive, and how they removed Carmichael's plan without discussing it with her, which she felt undermined her judgment and caused Carmichael not to respect her; and she described how she felt "a sense of entitlement" coming from Carmichael, noting that her "enrollment numbers are very good," and she felt that Orsini and Martinez were tolerating Carmichael's behavioral issues "because of her numbers." (*Id.*) Nowhere in the email does Mancini tell Gilliam about any comments Carmichael made about her physical appearance or that she felt discriminated against or treated differently by Carmichael because of her sex. (Ps' 56.1 Resp. ¶¶ 144-145.)

Gilliam replied the next day and scheduled a meeting with Mancini for July 12. (Nanau Decl. Ex. 29 at D003248-49.) On July 8, Carmichael emailed Gilliam as well, complaining that she felt bullied and harassed by Mancini. (Ps' 56.1 Resp. ¶ 146.)

### 6. Productivity Concerns

Meanwhile, Orsini and Martinez had become increasingly concerned with enrollment numbers. (*See id.* ¶¶ 160-164.) In May 2017, they had reached out to Catherine Palmer, a former vice president of admissions and COO who was semi-retired, to conduct training and assess the department's performance. (*Id.* ¶ 167.) According to Palmer's assessment, the White Plains campus (along with the New York City campus) was losing an unusually high number of applicants. (*See id.* ¶¶ 168-169.)

On May 15, Estevez emailed expected registration numbers to Bertone; Estevez had seven students who she expected to register by the end of May, whereas Lapan had thirty. (Doc. 69-4 ("Bertone Decl.") Ex. A at D003527.) Bertone replied asking why she had so few ready to register and asked what he could do to help increase her numbers. (*Id.*)

On June 19, Martinez emailed Mancini about the "[e]xtremely low productivity" in the department, and he detailed the recruitment numbers for adult admissions as follows:

| Employee | Applications | Students Registered |
|---|---|---|
| Carmichael | 27 | 11 |
| Mancini | 15 | 6 |
| Mekuli | 11 | 3 |
| Ovimeleh | 8 | 2 |

(Doc. 69-8 ("Martinez Decl") Ex. A; Ps' 56.1 Resp. ¶ 170.)  Martinez noted that at the current rate, adult admissions would not meet its expectations and that Mekuli and Ovimeleh in particular needed to improve their productivity.  (Martinez Decl. Ex. A.)  Along those same lines, Orsini emailed Mancini on June 20 and told her to increase the number of phone calls her team was making, as they were only making half the required number.  (Ps' 56.1 Resp. ¶ 173.)

On June 23, Bertone emailed the high school admissions department, telling them that he needed "everyone to increase overall productivity."  (Nanau Decl. Ex. 33.)  A few days later, Bertone gave Estevez a quarterly report noting that her recruitment numbers were "drastically behind the curve" and that she had only twelve applications, which was very low considering her goal of enrolling forty students.  (Ps' 56.1 Resp. ¶¶ 178, 180.)

### 7.   Plaintiffs' Termination

On July 12, 2017, Estevez, Mancini, and Mekuli were issued PIPs that indicated, among other things, that their productivity was well below required levels.  (*Id.* ¶¶ 175-176, 182-183.) Mekuli testified that Martinez told her the PIP was a formality and "no big deal."  (Nanau Decl. Ex. 13 at 337:12-338:8.)[9]  As with her 2014 PIP, this PIP warned that "failure to meet these

---

[9] Plaintiffs contend that Martinez said something similar to Estevez, but that portion of Estevez's testimony is not in the record at the cited location, and the Court has been unable to locate it elsewhere.  (*See* Ps' 56.1 Counterstmt. ¶ 14; Nanau Decl. Ex. 9 at 114:14-20.)

objectives during this period will result in further corrective action up to and including termination of employment." (Noonan Decl. Ex. CC at D-000179.)

After she received her PIP, Mancini met with Gilliam and discussed Mancini's July 6 email. (Ps' 56.1 Resp. ¶ 147; Noonan Decl. Ex. HH at 418:8-24.) Mancini testified that she did not feel comfortable telling Gilliam any more than what was in the email because she felt that she had been given her PIP in retaliation for complaining to human resources. (Noonan Decl. Ex. HH at 418:21-419:19.)

That same day, Carmichael also met with Gilliam. (Ps' 56.1 Resp. ¶ 151.) Carmichael talked about how she did not agree with her November 2016 PIP, how she "thought she was being ostracized by the other ladies in the . . . bullpen," and how she "thought that individuals were upset that she was reaching her goals and objectives" while "others [were] not performing to where she was." (Noonan Decl. Ex. LL at 103:5-104:5.) Gilliam asked Carmichael about taking garbage home and if she ever talked behind people's backs or talked in a derogatory fashion about people. (*Id.*) She also asked for specific examples of not getting along with others. (*Id.*)

Mekuli also met with Gilliam that day. (Ps' 56.1 Resp. ¶ 152.)[10] Mekuli spoke to her about Carmichael's "behaviors." (Noonan Decl. Ex. II at 188:8-10.) Specifically, she told Gilliam that Carmichael "constantly stare[d]" at her and that she had to move into her cubicle to hide her body, that she felt she had to be friends with Carmichael because she feared Carmichael's actions if she was not, that Carmichael texted her about a puppy after she asked

---

[10] Plaintiffs dispute Defendants' characterization of the meeting but do not dispute that it occurred on July 12. (*See* Ps' 56.1 Resp. ¶ 152.)

Carmichael not to contact her anymore, and that it was annoying and distracting when she saw Carmichael staring at and making comments to other people.  (*Id.* Ex. II at 188:11-190:21.)

Estevez testified that she never met with Gilliam, (*Id.* Ex. JJ at 341:23-342:22), but Gilliam testified that at some unspecified time, Estevez complained to her about Lapan, (Nanau Decl. Ex. 8 at 86:9-15).  Specifically, Estevez[11] mentioned that Lapan and Martinez had gone out to lunch, which Gilliam said was "not an abnormal thing for anybody."  (Noonan Reply Decl. Ex. RR at 86:16-87:2.)[12]

By July 24, Mekuli had only twenty-four applications out of a goal of fifty-six, and Mancini told her that she would need to increase the number of phone calls and appointments she made.  (Ps' 56.1 Resp. ¶ 185.)  By then, Carmichael had fifty applications out of a goal of fifty-six and was on track to reach her goals.  (*Id.* ¶ 186.)

On August 3, Bertone observed one of Estevez's interviews and emailed Estevez afterward, writing that she "lacked any energy whatsoever and most importantly, [Estevez] missed an opportunity to help a student who did not have college plans."  (Bertone Decl. Ex. C at P00000172; *see* Ps' 56.1 Resp. ¶¶ 192-193.)  Bertone forwarded his observation to Gilliam and

---

[11] In Gilliam's deposition, the questioner said "Mancini," but given the context, it is clear that Gilliam is talking about Estevez because Gilliam testified that she did not recall Mancini complaining about Lapan.  (*See* Doc. 71 ("Noonan Reply Decl.") Ex. RR at 86:9-22.)

[12] Plaintiffs assert that Gilliam "confirmed that Estevez complained to her about Lapan's 'too much estrogen' comments, his separate office, and other special treatment Lapan was afforded."  (Ps' Opp. at 10.)  For support, Plaintiffs cite to paragraph 158 of their responsive 56.1 Statement, which, in turn, cites a portion of Gilliam's deposition in which Gilliam testifies that Estevez complained to her about Lapan going out to lunch with Martinez.  (*See* Ps' 56.1 Resp. ¶ 158; Nanau Decl. Ex. 8 at 86:9-22.)  Plaintiffs do not cite to any portion of the record that supports their assertion that Estevez complained to Gilliam about Lapan's "too much estrogen" comments or his separate office.  Moreover, Gilliam testified that no one told her that Lapan did not sit in the bullpen because it had "too much estrogen."  (Noonan Reply Decl. Ex. RR at 89:15-18.)

noted that Estevez "is on corrective action with relatively no improvement." (Bertone Decl. Ex. D at D003283.)

By mid-August, the recruitment numbers for adult admissions were as follows:

| Employee | Students Registered |
|---|---|
| Carmichael | 20 |
| Mancini | 9 |
| Mekuli | 8 |
| Ovimeleh | 11 |

(Ps' 56.1 Resp. ¶ 187.) On August 14, Orsini emailed Bertone and told him that, based on their recruitment numbers and barring a drastic change, she planned to terminate Mancini, Mekuli, and Ovimeleh on September 6. (Orsini Decl. Ex. C at D003258.) Later in August, however, Orsini decided not to move forward with Ovimeleh's termination. (Ps' 56.1 Resp. ¶ 191.) According to Orsini, she decided not to terminate Ovimeleh because she had recently moved to the adult admissions department in April 2017, had made some progress, and was not on a PIP at that time. (Orsini Decl. ¶ 23.)[13]

On August 21, Martinez messaged Bertone and told him that "all is set" for September 6, the day Plaintiffs would be terminated, and that Estevez "is not part of that as of yet unless [Gilliam] hears from you" and that the decision is "up to you Boss." (Nanau Decl. Ex. 28.)

---

[13] Plaintiffs assert that Ovimeleh was issued a PIP in 2016 and "it is undisputed that it was never rescinded or revoked." (Ps' 56.1 Resp. ¶ 191.) Although Ovimeleh was, indeed, issued a PIP in 2016, (*see* Nanau Decl. Ex. 6), the portions of the record that Plaintiffs cite do not support the proposition that it was never rescinded or revoked. Regardless, I do not accept the truth of Orsini's proffered explanation because she is an interested witness that the jury is not required to believe. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (on motion for summary judgment, district court "must disregard all evidence favorable to the moving party that the jury is not required to believe"); *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (same); *Williams v. City of White Plains*, 718 F. Supp. 2d 374, 377 (S.D.N.Y. 2010) (evidence that court should disregard on summary judgment "includes testimony and affidavits from interested witnesses").

Martinez mentioned that he was advocating against Mancini's and Mekuli's termination and that terminating only Estevez and Ovimeleh would "send a message." (*Id.*)

By late August, Estevez was on track to enroll only twelve students (out of a goal of forty), whereas Lapan was exceeding expectations and ultimately enrolled forty-five students. (Ps' 56.1 Resp. ¶ 195.)[14]   On August 28, Bertone emailed Gilliam and informed her that he recommended terminating Estevez "based on her lack of productivity" and her lack of improvement since the issuance of her PIP. (Bertone Decl. Ex. E at D003322-23; *see* Ps' 56.1 Resp. ¶ 197.)

Gilliam said that she did not believe Plaintiffs should be terminated and recommended that they be given more time to deal with their performance issues, but she was overruled by senior management. (Nanau Decl. Ex. 8 at 121:19-122:7.)   On September 6, Orsini met with Mancini and Mekuli and informed them that they were terminated, and Bertone met with Estevez and informed her that she was terminated. (Ps' 56.1 Resp. ¶ 201.)

After she was terminated, Havelka called Mancini and conveyed an offer from Martinez for Mancini to work at Berkeley's New York City campus, which Mancini declined. (*Id.* ¶ 203; Noonan Decl. Ex. HH at 104:12-106:10.)

After Estevez was terminated, she exchanged text messages with Martinez in Spanish, which Estevez translated during her deposition. (Noonan Reply Decl. Ex. TT at 270:3-276:15; *see* Nanau Decl. Ex. 23.)   Martinez expressed how sorry he was that Estevez was terminated and offered to meet her face-to-face if she wanted to talk. (Noonan Reply Decl. Ex. TT at 273:2-18.) Estevez replied that it was a pleasure getting to know him and wished him good luck. (*Id.* Ex.

---

[14] Because Plaintiffs did not respond to paragraph 195 of Defendants' 56.1 Statement, I deem the corresponding facts admitted. (*See* Ps' 56.1 Resp. ¶ 195.)

TT at 273:19-274:8.)  Martinez responded that if he were her associate vice president, she would still be working for him, but that it is better off this way because Estevez "would have gotten [him] in trouble."  (*Id.* Ex. TT at 274:9-14.)  Estevez understood this to mean that Martinez was glad that she did not work at Berkeley anymore because now he could have a "sexual or intimate relationship with [her] outside of work."  (*Id.* Ex. TT at 277:11-21.)  It is undisputed that while Estevez worked at Berkeley, Martinez never asked her out on a date.  (Ps' 56.1 Resp. ¶ 210.)

### B.   <u>Procedural History</u>

Plaintiffs brought this action on November 7, 2018, initially naming only Berkeley and Martinez as defendants.  (Doc. 1.)  Plaintiffs allege that Berkeley subjected them to a hostile work environment because of their sex and terminated them for complaining about it, all in violation of Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law ("NYSHRL").  (*See id.* ¶¶ 129-146.)  They also brought an aiding and abetting claim against Martinez pursuant to NYSHRL Section 296(6).  (*See id.* ¶¶ 147-149.)  A few months into discovery, Plaintiffs received leave to file an amended complaint adding Orsini and Bertone as defendants and adding NYSHRL aiding and abetting claims against them.  (*See* Doc. 28 ¶¶ 153-154.)

After the close of fact discovery, Defendants filed a pre-motion letter in anticipation of their motion for summary judgment.  (Doc. 45.)  Plaintiffs responded, (Doc. 48), and the Court held a pre-motion conference and set a briefing schedule, (Minute Entry dated Mar. 24, 2020).  After several extensions, the parties filed their motion papers simultaneously on November 11, 2020.  (Docs. 68-78.)

Less than a week later, Defendants filed a pre-motion letter requesting a conference regarding an anticipated motion to strike Plaintiffs' responsive 56.1 Statement for failure to

comply with Local Rule 56.1 and my Individual Practices.  (Doc. 79.)  I denied the request as

moot, ordered Plaintiffs' responsive 56.1 Statement to be stricken from the record for failure to

comply with my Individual Practices, and ordered Plaintiffs to resubmit their responsive 56.1

Statement.  (Doc. 80.)  In that same Order, I reminded Plaintiffs of Local Rule 56.1's

requirements – specifically, that Plaintiffs must include in their response to each paragraph only

whether the facts are disputed and the basis for the dispute, that the response must be confined to

the statement that Defendants set forth, that argument or other evidence that Plaintiffs believe to

be helpful belongs in their memorandum of law, and that the counterstatement permitted by

Local Rule 56.1(b) is for additional material facts Plaintiffs believe to be in dispute, not

argument or other facts Plaintiffs find helpful.  (*Id.*)

The next day, Plaintiffs requested that I modify my Order to require Defendants to

resubmit a 56.1 Statement of twenty-five pages or less, (Doc. 83), even though I had granted

both sides up to thirty pages for their 56.1 Statements, (Doc. 57), and Defendants' 56.1

Statement was only twenty-eight pages, (*see* Doc. 69-3 ("Ds' 56.1 Stmt.")).  I denied the request

and once again explained Local Rule 56.1's requirements, this time using specific examples from

Plaintiffs' letter.  (*See* Doc. 84.)

On December 1, 2020, Plaintiffs filed their responsive 56.1 Statement, an amended

opposition memorandum, and a 56.1 Counterstatement.  (Docs. 87-89.)[15]  Despite my

admonitions, Plaintiffs' 56.1 Counterstatement of "disputed facts" consists largely of additional

---

[15] Although the refiled responsive 56.1 Statement reproduced most of each of
Defendants' 56.1 Statement entries in accordance with item 2.C.i of my Individual Practices
(requiring opposing party to reproduce moving party's entry above opposing party's response),
Plaintiffs (apparently intentionally) omitted Defendants' citations to the record.  (*E.g.*, Ps' 56.1
Resp. ¶ 1.)  Plaintiffs' failure to reproduce Defendants' citations defeats the purpose of this
individual practice, which is designed to obviate the need to go back and forth between the Rule
56.1 Statement and the response.

facts that Plaintiffs do not regard as disputed but rather believe to be helpful.  (*E.g.*, Doc. 89

("Ps' 56.1 Counterstmt.") ¶ 1.)  "[S]uch a statement is not permitted under Local Rule 56.1."

*Ostreicher v. Chase Bank USA, N.A.*, No. 19-CV-8175, 2020 WL 6809059, at *1 n.1 (S.D.N.Y.

Nov. 19, 2020) ("There is no provision for a responsive 56.1 Statement to include additional

facts that are not in dispute but that a party opposing summary judgment simply thinks are

important; any additional facts should be confined to material facts in dispute.").

Two weeks later, Defendants filed a response to Plaintiffs' 56.1 Counterstatement,

(Doc. 90), as well as a letter detailing portions of Plaintiffs' submissions that Defendants argued

should be stricken, (Doc. 92).  Plaintiffs responded, (Doc. 93), Defendants filed a reply letter,

(Doc. 94), and I ordered the parties to stop submitting letters, noting that I would decide what is

and is not proper to consider once I turned to the motion, (Doc. 95).  Having reviewed the

parties' submissions, I find it unnecessary to rule on Defendants' request because it is immaterial

to the outcome of this motion.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). If "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

III.   **DISCUSSION**

Defendants argue that Plaintiffs have failed to present sufficient evidence to establish their hostile work environment and retaliation claims against Berkeley and that, consequently, Plaintiffs' aiding and abetting claims against Martinez, Orsini, and Bertone must be dismissed as well.  (*See* Doc. 69 ("Ds' Mem.") at 8 & n.1.)

A.   **Hostile Work Environment**

"To prove a hostile work environment claim under Title VII,[16] a plaintiff must establish that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Legg v. Ulster County*, 979 F.3d 101, 114 (2d Cir. 2020) (cleaned up).  "This showing has both objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  *Id.* (cleaned up).  Furthermore, a plaintiff must demonstrate that the conduct occurred "because of" her protected status – here, her sex – and "that a specific basis exists for imputing the conduct that created the hostile environment to the employer."  *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102 (2d Cir. 2020) (cleaned up).

"The objective hostility of a work environment depends on the totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances[,] including the social context in which particular behavior occurs and is experienced by its target."  *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir.

---

[16] Because "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII," I analyze them together.  *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (cleaned up).

2012) (cleaned up).  Accordingly, courts must take care "not to view individual incidents in isolation" or "view the record in piecemeal fashion."  *Id.*  Factors considered as part of the totality of the circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance."  *Legg*, 979 F.3d at 114-15 (cleaned up).  "Facially sex-neutral incidents may be included among the totality of the circumstances that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex."  *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (cleaned up).

To be deemed "pervasive," discriminatory incidents "must be more than episodic; they must be sufficiently continuous and concerted."  *Agosto*, 982 F.3d at 102 (cleaned up).  A single incident may suffice to create a hostile work environment, "but to do so it must be extraordinarily severe."  *Id.* (cleaned up).  "A plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions."  *Rodriguez v. County of Nassau*, 830 F. App'x 335, 339 (2d Cir. 2020) (summary order) (cleaned up).

Title VII, however, "does not set forth a general civility code for the American workplace," *Redd*, 678 F.3d at 176 (cleaned up), and it "does not prohibit employers from maintaining nasty, unpleasant workplaces, or even ones that are unpleasant for reasons that are sexual in nature," *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010). "The critical issue, . . . is whether members of one sex are exposed to disadvantageous terms or

conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (cleaned up).

"The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact," and "summary judgment is appropriate only if it can be concluded as a matter of law that no rational juror could view the defendant's conduct as an intolerable alteration of the plaintiff's working conditions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) (cleaned up). "The line between complaints that are easily susceptible to dismissal as a matter of law and those that are not is indistinct." *Redd*, 678 F.3d at 177.

> On one side lie complaints of sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; and obscene language or gestures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers. And on either side of the line there are, depending on the circumstances, gradations of abusiveness.

*Id.* "While this determination may involve difficult line-drawing that is sometimes best left for a jury, summary judgment is appropriate when reasonable minds could not differ on the issue of whether a work environment is hostile." *O'Dell v. Trans World Ent. Corp.*, 153 F. Supp. 2d 378, 386 n.3 (S.D.N.Y. 2001) (cleaned up), *aff'd*, 40 F. App'x 628 (2d Cir. 2002) (summary order).

Plaintiffs' hostile work environment claims center on the conduct of three individuals: Carmichael, Lapan, and Martinez. (*See* Ps' Opp. at 15-23.) Although I address their conduct separately for organizational purposes, I consider the combined effect of their conduct as part of the totality of the circumstances. *See Redd*, 678 F.3d at 176.

###### 1.     Carmichael's Conduct

According to Plaintiffs, Carmichael created a sexually discriminatory hostile work environment by making comments about their physical appearance and staring at them. (*See* Ps' Opp. at 2, 16-18.) Defendants argue that they are entitled to summary judgment because

Plaintiffs have not established that Carmichael's conduct was "because of" their sex or that it was severe or pervasive enough to create a hostile work environment.  (*See* Ds' Mem. at 1-2, 9-16.)

> a.     Whether Carmichael's Conduct Was "Because of" Plaintiffs' Sex

"Nothing in Title VII necessarily bars a claim of discrimination 'because of sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex."  *Oncale*, 523 U.S. at 79 (cleaned up).  But in contrast to most male-female sexual harassment situations, where an inference of discrimination is easy to draw because "the challenged conduct typically involves explicit or implicit proposals of sexual activity," the same inference is available to a plaintiff alleging same-sex harassment only where there is "credible evidence that the harasser was homosexual."  *Id.* at 80.  Here, it is undisputed that Carmichael is heterosexual, so that inference is unavailable.  (*See* Ps' 56.1 Resp. ¶ 78.)

Nevertheless, "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."  *Oncale*, 523 U.S. at 80.

> A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.  A same-sex harassment plaintiff may also, of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.

*Id.* at 80-81.

Carmichael did not use "such sex-specific and derogatory terms" as to make it clear, or even debatable, that she was "motivated by general hostility to the presence of women in the workplace."  *Id.* at 80.  Her comments, although unwelcome, were not derogatory at all.  She would call Plaintiffs "skinny," "great," "thin," "attractive," "appealing," "pretty," "little," "petite," "tan," and "beautiful."  The only potentially negative, sex-specific comment Carmichael

made was about how Mancini looked "huge" during her pregnancy, but even that is insufficient for a reasonable jury to infer that Carmichael was motivated by general hostility toward women.

There is at least arguably a question of fact, however, about how Carmichael treated members of both sexes in a mixed-sex workplace. When asked whether Carmichael made comments about men, Mancini answered, "Not that I recall" in reference to Lapan, Bertone, and Martinez, (Noonan Decl. Ex. HH at 287:8-23), and Estevez answered, "Not that I recall" and "Definitely not" in reference to Lapan and Havelka, respectively, (*id.* Ex. JJ at 174:22-175:9). Even though Havelka and Bertone submitted unrefuted declarations that Carmichael made comments about their physical appearance, (*see* Ps' 56.1 Resp. ¶¶ 80-84), because they are interested witnesses, a reasonable jury could choose not to believe them and instead believe Plaintiffs, who testified that they did not hear Carmichael make such comments to the men in the office, *see Reeves*, 530 U.S. at 151; *Davis-Garett*, 921 F.3d at 46; *Williams*, 718 F. Supp. 2d at 377. Similarly, a reasonable jury could find that even if Carmichael made those comments to Havelka and Bertone, they were materially different than her comments about Plaintiffs because they, for the most part, focused on Havelka and Bertone's clothing (*e.g.*, their jeans, sweater, suit, shirt, or tie) rather than their bodies.

Defendants argue that the White Plains admissions department was not a mixed-sex workplace and that direct comparative evidence is therefore unavailable. (Ds' Mem. at 12 n.3.) While it is undisputed that during the relevant time period, the only employees who regularly worked in the bullpen were female, (*see* Ds' 56.1 Stmt. ¶ 27 n.4; Ps' 56.1 Resp. ¶ 27 n.3), Defendants produced evidence that Carmichael nevertheless had an opportunity to comment on

the physical appearance of men who worked outside the bullpen, (*see* Bertone Decl. ¶¶ 42-44; Doc. 69-11 ¶¶ 13-14), which forecloses this argument.[17]

    b. <u>Whether Carmichael's Conduct Was Severe or Pervasive</u>

  Regardless of whether Carmichael's comments and staring were "because of" Plaintiffs' sex, Defendants are entitled to summary judgment because Carmichael's conduct was not severe or pervasive enough to create a hostile work environment.

  Beginning with Carmichael's comments, even well-intentioned compliments can create a hostile work environment if a reasonable person would consider them sufficiently severe or pervasive to alter a condition of employment. *See Torres v. Pisano*, 116 F.3d 625, 632 n.6 (2d Cir. 1997). Plaintiffs argue that Carmichael's tone and body language when she complimented Plaintiffs' appearance suggested that it was not to make them feel good, but rather was a passive-aggressive way to express her resentment and jealousy of Plaintiffs. (Ps' Opp. at 22.) But even assuming that Carmichael's comments about Plaintiffs' bodies, clothes, lipstick, and hair were all backhanded compliments, they are too mild and innocuous to create a hostile work environment. *See Spina v. Our Lady of Mercy Med. Ctr.*, No. 97-CV-4661, 2003 WL 22434143, at *3-4 (S.D.N.Y. Oct. 23, 2003) (supervisor's compliments about plaintiff's hair and eyes, comment that she "looked good in tight pants," and reference to her as a "bitch," were "simply

---

  [17] That said, it seems to the Court that a woman commenting more freely on the appearance of her female co-workers than on that of males who worked in other workplace areas creates the weakest of inferences. Title VII "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Oncale*, 523 U.S. at 81. Further, it seems apparent to the Court that Carmichael's conduct was not based on hostility toward women but was either, as Plaintiffs apparently believe, a pitiful attempt to be one of the group from which she felt excluded, (*see* Ps' 56.1 Resp. ¶¶ 54, 72, 79; Noonan Decl. Ex. II at 189:4-13), or mind games by a hyper-ambitious worker toward her competitors, who just happened to be women. Nevertheless, I assume for the sake of argument that a jury could conclude that Carmichael treated women differently because of their sex.

too mild and innocuous" to create a hostile work environment, and his "constant" yelling and

staring "was similarly mild," particularly given that he "never touched plaintiff in a sexual

manner, did not ask her to go out with him or engage in a sexual relationship, and never made

any lewd gestures"), *aff'd*, 120 F. App'x 408 (2d Cir. 2005) (summary order); *Bailey v. Nexstar*

*Broad., Inc.*, No. 19-CV-671, 2021 WL 848787, at *19 (D. Conn. Mar. 6, 2021) (granting

summary judgment where "the challenged comments were complimentary, innocuous, and never

referred to sexual activity, never referred to sexual characteristics, and never used derogatory

sexualized language" and "Plaintiff never seriously told his co-workers to desist comments about

his appearance, hair, or relationship status").  Although Carmichael's comments may have been

unwelcome, behavior that would make a reasonable person even more uncomfortable than the

behavior here has been found insufficient to create a hostile work environment.  *See Feliciano v.*

*Alpha Sector, Inc.*, No. 00-CV-9309, 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002)

(granting summary judgment where supervisor complimented plaintiff, said he wanted to date

her, attempted to hug her, stated on one occasion that he wanted to "lay with" her, and kissed her

after giving her after giving her a ride home, and noting that although the supervisor "may well

have breached the bounds of politesse" and plaintiff "may not have appreciated [his] interest in

her, his activities . . . do not constitute actionable offenses under Title VII").

　　　　Likewise, Carmichael's staring, given the totality of the circumstances, is insufficient as a

matter of law to create a hostile work environment.  *See Agosto*, 982 F.3d at 102 (staring,

sneering, cat-calling, singing, and yelling incidents insufficient to create an objectively hostile

workplace); *Lewis v. City of Norwalk*, 562 F. App'x 25, 28-29 (2d Cir. 2014) (summary order)

(supervisor licking his lips and "leering," when considered under the totality of the

circumstances with facially sex-neutral incidents, did not create an environment that a reasonable

person would find hostile or abusive, even if it made plaintiff subjectively uncomfortable); *Beiter v. Runyon*, 50 F. App'x 32, 35 (2d Cir. 2002) (summary order) (supervisor's actions, which included constantly staring at plaintiff, were insufficient to create a hostile environment); *Gibson v. Jacob K. Javits Convention Ctr. of N.Y.*, No. 95-CV-9728, 1998 WL 132796, at *9-10 (S.D.N.Y. Mar. 23, 1998) (alleged harasser's practice of regularly entering plaintiff's office "without invitation apparently for the sole purpose of staring at specific portions of her anatomy" was "insufficient to support a hostile environment claim") (cleaned up).  Even if, as Plaintiffs contend, Carmichael's staring and comments began to inform how they dressed for work, (*see* Ps' Opp. at 22), that is not enough to create an objectively hostile or abusive work environment, *see DeSimone v. JP Morgan/Chase Bank*, No. 02-CV-7039, 2004 WL 2978011, at *6 (S.D.N.Y. Dec. 22, 2004) (alleged harasser's conduct that compelled plaintiff to dress more conservatively, including leering and staring at plaintiff's body, "although unquestionably offensive and inappropriate, was not so severe or pervasive as to alter the terms and conditions of a reasonable person's employment").

Plaintiffs also contend that Carmichael was "generally hostile" to other women in the office; for example, she stole another associate's students.  (Ps' Opp. at 17.)  This practice was admittedly fair game, however, and just because Carmichael was a difficult person with whom to work does not mean that Plaintiffs were subject to a hostile work environment.  *See Spina*, 2003 WL 22434143, at *4 (Title VII "may not be used for turning otherwise ordinary disputes . . . into a claim for sexual harassment.").  Considering the totality of the circumstances (including Lapan's and Martinez's conduct, discussed below), Carmichael's conduct was not sufficiently severe or pervasive to create an abusive working environment.  *See Lamar v. Nynex Serv. Co.*, 891 F. Supp. 184, 185 (S.D.N.Y. 1995) (supervisor's conduct, which consisted of touching

plaintiff's hand, saying she looked "hot," and staring at her, was "too mild and innocuous to constitute sexual harassment as a matter of law").

### 2.    Lapan's Conduct

According to Plaintiffs, Lapan's comments about there being "too much estrogen" in the bullpen created a hostile work environment.  (Ps' Opp. at 20-21.)  Defendants argue that Lapan's comments are too infrequent and mild to do so.  (Ds' Mem. at 17.)  I agree.

As Defendants note and Plaintiffs do not contest, Mancini never testified that she heard Lapan make this comment.  (*See id.*)  Mekuli testified that she heard Lapan make this comment twice – once shortly after he started and again in May or June of 2017.  (Noonan Decl. Ex. II at 250:2-21.)  While Lapan's comment may be "offensive and inappropriate," it is not in the category of "extraordinarily severe" isolated occurrences that create a hostile work environment, and it is less severe than conduct that has been held to be "insufficient to survive summary judgment."  *Agosto*, 982 F.3d at 103 (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998), in which plaintiff's colleague made a sexualized comment and then deliberately touched her breasts with papers he was holding).  Instead, "[t]hese incidents amount to little more than 'the sporadic use of abusive language, gender-related jokes, and occasional teasing' that fail to create a hostile environment."  *Vito v. Bausch & Lomb Inc.*, 403 F. App'x 593, 596 (2d Cir. 2010) (summary order) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)); *see Robinson v. Dibble*, 613 F. App'x 9, 13 (2d Cir. 2015) (summary order) (affirming summary judgment for defendants where "evidence of crude and offensive comments directed at [plaintiff's] gender or mental health issues that were delivered sporadically by coworkers . . . , while condemnable, did not rise to the level of creating an abusive and hostile workplace environment."); *Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d

Cir. 2012) (summary order) (affirming summary judgment for defendants where "the record indicates only limited, infrequent, and at worst, mildly offensive conduct falling well short of the severity and frequency required to raise a triable issue of fact as to the existence of an objectively hostile work environment").

Estevez testified that Lapan made the "too much estrogen" comment "constantly," perhaps more than thirty times in a year. (Noonan Decl. Ex. JJ at 146:8-147:25.) But even if that is true, the comment is still too mild and innocuous to create a hostile work environment. *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 76 (2d Cir. 2010) (co-worker calling women "chickies" was "too trivial to contribute to a Title VII hostile work environment claim"). A reasonable jury could not find that the ignorant remark of a colleague, directed not to an individual but to a group, suggesting he did not want to work in a roomful of women, even if repeated every couple of weeks or so, could sufficiently contribute to the alteration of Estevez's working conditions for the worse as to create a hostile environment. Lapan's schtick was unfunny and distasteful, but it is the sort of conduct ordinarily greeted with eyerolls or snappy comebacks. It was not sufficiently severe or pervasive to create an abusive working environment, even when viewed in light of Carmichael's conduct (described above) and Martinez's conduct (described below).

### 3.    Martinez's Conduct

Plaintiffs argue that Martinez engaged in various behaviors that created a hostile work environment. First, they assert that Martinez flirted with Estevez in Spanish and would make "unwanted sexual jokes and comments." (Ps' Opp. at 2, 20-21.) But this is not supported by the record. Estevez described Martinez's jokes as a "rude, weird, flirty way to make a connection," but she could not recall a single joke that he made to her, and she said that "he was probably

referring to [their] culture" or "everyday stuff."  (Noonan Decl. Ex. JJ at 369:12-370:6.)

"Without any detail or even the sum and substance of the jokes, no reasonable jury could

evaluate the severity of the purported jokes or whether they contributed to creating a hostile

work environment." *Jackson v. Citiwide Corp. Transp., Inc.*, No. 02-CV-1323, 2004 WL

307243, at *3 (S.D.N.Y. Feb. 17, 2004).  And even if Martinez's motivation for speaking to

Estevez in Spanish was to flirt with her, this does not even approach the severity of more direct

romantic advances that have nonetheless been found insufficient to create a hostile work

environment.  *See Feliciano*, 2002 WL 1492139, at *8; *see also Oncale*, 523 U.S. at 81 (holding

that "ordinary socializing in the workplace," including "intersexual flirtation," does not create

discriminatory conditions of employment).

Plaintiffs note that after Estevez was terminated, Martinez "intimated that he wanted to

have a sexual relationship with her in a text."  (Ps' Opp. at 2; *see id.* at 20-21.)  But this cannot

contribute to a hostile work environment, because it occurred after her termination and therefore

could not have altered her working conditions.  *See Hopkins v. Bridgeport Bd. of Educ.*, 834 F.

Supp. 2d 58, 65 (D. Conn. 2011).

Second, Plaintiffs contend that Martinez created a hostile work environment by asking

Mekuli whether Mancini would "be able to perform the way she did with the new baby."  (Nanau

Decl. Ex. 13 at 260:8-21; *see* Ps' Opp. at 2, 19.)  This isolated remark, however, is not severe

enough to constitute a Title VII violation.  *See Fletcher v. ABM Bldg. Value*, 775 F. App'x 8, 13

(2d Cir. 2019) (summary order) ("Stray remarks, even if made by a decisionmaker, do not

constitute sufficient evidence to make out a case of employment discrimination.") (cleaned up);

*Baron v. Winthrop Univ. Hosp.*, 211 F. App'x 16, 17 (2d Cir. 2006) (summary order) (series of

remarks evidencing bias against women in the workplace "were not sufficiently severe or

pervasive to alter the terms and conditions of plaintiff's employment, so as to constitute a hostile

work environment") (cleaned up).  Although the comment was "inappropriate, the record does

not suggest [it] altered the conditions of [Plaintiffs'] work environment so as to establish a

claim." *Campbell v. N.Y.C. Transit Auth.*, 662 F. App'x 57, 60 (2d Cir. 2016) (summary order).

Third, Plaintiffs argue that Martinez condoned Lapan's sexist comments about there

being "too much estrogen" by inviting Lapan to lunches and manager meetings.  (Ps' Opp. at

8.)[18]  To support this argument, Plaintiffs cite to Estevez's testimony that she complained to

Bertone about Lapan's "insubordination," the "hostility" in the admissions office, Lapan stealing

her students, and Martinez excluding her from managerial meeting and inviting Lapan instead.

(Ps' 56.1 Resp. ¶ 120.)  Plaintiffs do not cite any evidence that Estevez complained to Bertone

about Lapan's "too much estrogen" comments or that Martinez even knew about them.

Regardless, Estevez's occasional exclusion from lunches and meetings is too trivial to constitute

an abusive work environment.  *See Rosinski v. Am. Axle & Mfg., Inc.*, 402 F. App'x 535, 537 (2d

Cir. 2010) (summary order) (plaintiff's exclusion from a celebration was "too insignificant to

support a hostile work environment claim").

Fourth, Plaintiffs contend that Martinez undermined Mancini's authority by determining

that Carmichael should be supervised by Mekuli, and undermining a supervisor's authority

because she is a woman is actionable harassment under Title VII.  (Ps' Opp. at 20 (citing *Howley

v. Town of Stratford*, 217 F.3d 141, 154-55 (2d Cir. 2000).)  But Plaintiffs ignore the fact that

---

[18] Plaintiffs also argue that "Ovimeleh's mistreatment by Bertone after she complained about Lapan's 'too much estrogen' comments" contributed to the hostile work environment.  (Ps' Opp. at 16.)  But in the portion of Ovimeleh's deposition that Plaintiffs cite, Ovimeleh says that she complained to Bertone about Lapan's "insubordination," not his "too much estrogen" comments.  (*See* Nanau Decl. Ex. 5 at 42:8-22; Ps' 56.1 Counterstmt. ¶ 31 (the first of the two paragraphs numbered thirty-one).  Plaintiffs mischaracterize Ovimeleh's complaint to Bertone three times in their brief.  (*See* Ps' Opp. at 10 n.3, 16, 21.)

Martinez reassigned Carmichael's supervision to another woman, which forecloses the argument that it was done because of Mancini's sex.  And in contrast to the case Plaintiffs cite, in which the defendant undermined the plaintiff's authority by suggesting that she attained her position by performing sexual favors, *see Howley*, 217 F.3d at 154-55, undermining someone's authority by reassigning supervisors is not sufficiently severe to create a hostile work environment, *see O'Dell*, 153 F. Supp. 2d at 387 (supervisor's actions that allegedly undermined plaintiff's authority by withholding certain information from her and talking directly to her subordinates about things that needed to be done, even when viewed together with his "dogged" romantic pursuit of plaintiff, was "not sufficiently abusive as to render plaintiff's work environment hostile").

Ultimately, even when Carmichael's, Lapan's, and Martinez's actions are viewed together under the totality of the circumstances, no reasonable juror could find that Berkeley was permeated with gender-based discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the Plaintiffs' employment and create an abusive working environment.  Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Title VII and NYSHRL hostile work environment claims.

**B.    Retaliation**

Title VII prohibits employers from retaliating against an employee for opposing any practice made unlawful by Title VII.  *E.g.*, *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015).[19]  To establish a *prima facie* case of retaliation, an employee must show that (1) she "was engaged in protected activity, (2) the employer was aware of that activity, (3) the employee

---

[19] "Because the standards for evaluating retaliation claims are identical under Title VII and the NYSHRL," I analyze them together.  *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271 n.3 (2d Cir. 2016) (cleaned up).

suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action." *Agosto*, 982 F.3d at 104 (cleaned up). "This showing creates a presumption of retaliation, which the defendant may rebut by articulating a legitimate, non-retaliatory reason for the adverse employment action." *Chen*, 805 F.3d at 70 (cleaned up). "If the defendant provides such an explanation, the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (cleaned up).

According to Plaintiffs, they were terminated for complaining about a hostile work environment at Berkeley. (*See* Ps' Opp. at 2, 25-27.) Defendants argue that they are entitled to summary judgment because Plaintiffs have not established a *prima facie* case of retaliation, and even if they have, they were terminated for legitimate, nonretaliatory reasons. (*See* Ds' Mem. at 1-3, 20-29.)

### 1.    Plaintiffs' *Prima Facie* Case of Retaliation

Turning first to Plaintiffs' *prima facie* case, an employee's complaint qualifies as protected activity so long as the employee has a good faith, reasonable belief (assessed in light of the totality of the circumstances) that the employee was "opposing an employment practice made unlawful by Title VII." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14-15 (2d Cir. 2013) (*per curiam*) (cleaned up). "As to the second element of the *prima facie* case, implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Id.* at 15 (cleaned up). Although a plaintiff need not "append to each allegation of harassment the conclusory declaration 'and this was done because of my sex,'" a plaintiff's complaint must allege "factual circumstances that

permit the inference that plaintiff was subjected to a hostile work environment because of her sex." *Id.* (cleaned up).  Similarly, "[a]lthough particular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint, neither are they sufficient to do so if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory."  *Id.* at 17.

In their opposition memorandum, Plaintiffs assert that Estevez's April or May 2017 complaints to Bertone and Mancini's July 6, 2017 email to Gilliam constitute protected activity. (Ps' Opp. at 26.)  Regarding Estevez's complaints to Bertone, Plaintiffs assert that "Estevez did not merely complain to Bertone that Lapan was insubordinate," but that she complained about "Lapan's 'too much estrogen' comments, his refusal to sit in the Admissions Department office, his failure to follow her directives, as well as Martinez's condonation of Lapan's sexist comments and misconduct, and his undermining of her position as a supervisor by allowing Lapan to attend supervisor meetings that Estevez should have been invited to."  (Ps' Opp. at 26.)[20]  This whopper of an assertion is supported by the citation, "*See infra id.*," (*id.*), a nonsensical citation that roughly means, "See below the same authority cited immediately before," *see Infra* and *Id.*, *Black's Law Dictionary* (11th ed. 2019).  The immediately preceding authority cited is Defendants' memorandum, which, needless to say, does not support this

---

[20] Although Plaintiffs make the unsupported assertion in the facts section of their opposition memorandum that Estevez complained to Gilliam about Lapan's "too much estrogen" comments, (*see* note 12 above; Ps' Opp. at 10), in their argument section Plaintiffs do not assert that Estevez complained to Gilliam, nor do they contend that any such complaint was protected activity, (*see* Ps' Opp. at 13-30).  But including it in their facts section is bad enough.  That does not seem inadvertent, particularly in light of the unsupported assertions that Ovimeleh complained about the same comments.  (*See* note 18 above.)  Perhaps believing that their weak case would be bolstered if the decisionmakers knew about the "estrogen" remarks, Plaintiffs' counsel repeatedly, and without factual basis, claims that Plaintiffs raised complaints about it. Counsel is cautioned against such misleading conduct in the future.

proposition.  (*See* Ds' Mem. at 23.)  Regardless, the record does not support Plaintiffs' assertion

that Estevez complained to Bertone about Lapan's "too much estrogen" comments or Martinez's

condonation of Lapan's comments and misconduct.  Rather, the undisputed facts show that

Estevez complained to Bertone about Lapan being insubordinate by not speaking or listening to

her and by stealing her students, and that she also complained about Martinez inviting Lapan to

managerial meetings but excluding her, as well as the "hostility" and "inappropriate work

environment" in the admissions office.  (Noonan Decl. Ex. JJ at 204:14-213:12, 360:8-361:6.)

There is no evidence that Bertone knew of the "estrogen" remarks, and none of these complaints

describe facts from which Bertone could have inferred that Estevez was subjected to a hostile

work environment because of her sex.

Plaintiffs also argue that Mancini's July 6, 2017 email to Gilliam constitutes protected

activity.  (*See* Ps' Opp. at 2, 26.)  It is undisputed, however, that nowhere in the email does

Mancini tell Gilliam about any comments Carmichael made about her physical appearance or

indicate that she felt discriminated against or treated differently by Carmichael because of her

sex.  (Ps' 56.1 Resp. ¶¶ 144-145.)  Mancini's use of the phrase "toxic work environment" does

not convert her complaint into a protected one, because nothing in the substance of the email

suggests that the complained-of activity was because of her sex.  *See Kelly*, 716 F.3d at 17; *see

also Foster v. Humane Soc'y of Rochester & Monroe Cnty., Inc.*, 724 F. Supp. 2d 382, 395

(W.D.N.Y. 2010) ("[T]he mere fact that plaintiff used the term 'hostile environment' in her

email to her supervisor is not enough; the court must look at the substance of her complaint, not

the terminology that she used."); *Fields v. Locke Lord Bissell & Liddell LLP*, No. 07-CV-2984,

2009 WL 2341981, at *16 (N.D. Ga. July 28, 2009) (use of Title VII buzzword does not suffice to render statement protected activity).[21]

Plaintiffs contend that Mancini's email cannot be read in a vacuum and "must be understood in context" – specifically, that Gilliam, Orsini, and Martinez "all had actual knowledge of Carmichael's harassing conduct" because they all knew that Carmichael had been issued a PIP for her "misbehavior" in 2016.  (Ps' Opp. at 26.)  It is true that Mancini's email should be read in context.  *See Lenzi v. Systemax, Inc.*, 944 F.3d 97, 113 (2d Cir. 2019) (given that plaintiff had complained on other occasions that she was not being treated the same as men, the word "peers" in plaintiff's email "reasonably suggested she was taking issue with being paid less than her *male* peers") (emphasis in original).  But reading Mancini's email in context with Carmichael's 2016 PIP does not help Plaintiffs' case, because the PIP did not mention Carmichael staring at co-workers or making comments about their physical appearance.  (Noonan Decl. Ex. J; Ps' 56.1 Resp. ¶ 62.)  And even if Mancini's supervisors knew about Carmichael's staring or comments, there is nothing in Mancini's email that suggests she was complaining about those behaviors or any other conduct that Mancini believed was prohibited by Title VII.

---

[21] It does appear, perhaps because of the quantitative goals Plaintiffs were required to meet, that gossiping, sniping, and backstabbing were present in Plaintiffs' workplace.  But none of that suggests discrimination based on sex.  Unfortunately, the term "hostile work environment" has been interpreted by some in the general public to refer to workplaces with abusive bosses, bullying, cutthroat competition, nastiness, or unfairness.  While those workplaces may be hostile in the colloquial sense, they do not violate the law unless they are that way because of an employee's protected characteristic.  And complaints about workplace hostility in the colloquial sense do not suffice to alert the employer to alleged discrimination based on a protected characteristic.

Simply put, Estevez's and Mancini's complaints "could easily have described a conflict between co-workers of any sex – regardless of the presence or absence of discriminatory animus – and in these circumstances," no reasonable jury could find that Plaintiffs' complaints related to sex discrimination. *Rosioreanu v. City of N.Y.*, 526 F. App'x 118, 120 (2d Cir. 2013) (summary order); *see Benn v. City of N.Y.*, 482 F. App'x 637, 638-39 (2d Cir. 2012) (summary order) (plaintiff's complaints to his supervisors about "the teaching curriculum and his responsibilities, the condescending manner in which one supervisor spoke to him, and a late-night phone call from a supervisor that disturbed his sleep . . . could not reasonably have been understood to protest statutorily prohibited discrimination and, thus, do not qualify as protected activity that may give rise to a claim of retaliation"); *Rojas*, 660 F.3d at 102-03, 108 (employer could not have reasonably understood that plaintiff was complaining of conduct prohibited by Title VII when she complained that a co-worker was making her life miserable and that the employer needed to take action); *Malaney v. Elal Israel Airlines*, 331 F. App'x 772, 775 (2d Cir. 2009) (summary order) (plaintiff's "complaints to her supervisor and union did not include allegations of discrimination or other unlawful employment practices sufficient to demonstrate participation in a protected activity"); *see also McDowell v. T-Mobile USA, Inc.*, 307 F. App'x 531, 534 (2d Cir. 2009) (unpublished opinion) ("[T]here is no evidence in the record – other than plaintiff's own testimony regarding his intent – on which a jury could conclude that plaintiff's supervisors could have understood that plaintiff's complaints about a paperwork delay and a co-worker's career were about race.").

Defendants argue that Mekuli did not make any protected complaints, either.  (Ds' Mem. at 23.)  Plaintiffs failed to respond to this argument in their opposition, (*see* Ps' Opp. at 24-27), and have therefore abandoned Mekuli's retaliation claim, *see Shen v. City of N.Y.*, 725 F. App'x

7, 17 (2d Cir. 2018) (summary order) ("We have explained that, 'in the case of a counseled

party, a court may, when appropriate, infer from a party's partial opposition that relevant

claims . . . that are not defended have been abandoned.'") (alteration in original) (quoting

*Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014)); *Collins v. City of N.Y.*, 295 F. Supp.

3d 350, 361 (S.D.N.Y. 2018) ("Federal courts may deem a claim abandoned when a party

opposing summary judgment fails to address the movant's argument in any way.") (cleaned up),

*reconsideration denied*, No. 14-CV-8815, 2019 WL 1413999 (S.D.N.Y. Mar. 29, 2019).

### 2.    Defendants' Proffered Reason for Plaintiffs' Termination

Even if Plaintiffs were able to establish a *prima facie* case of retaliation, Defendants

argue that Plaintiffs were terminated for a legitimate, nonretaliatory reason – namely, failing to

meet performance expectations.  (*See* Ds' Mem. at 1, 27-29.)  Indeed, Plaintiffs' poor

recruitment numbers prior to their termination are undisputed.  In their opposition memorandum,

Plaintiffs do not dispute that this is a legitimate, nonretaliatory reason for terminating their

employment.  (*See* Ps' Opp. at 24-29.)

"If the employer demonstrates a legitimate, non-discriminatory reason, then the burden

shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the

employer's action was, in fact, motivated by discriminatory retaliation."  *Summa v. Hofstra*

*Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (cleaned up).  "While a Title VII plaintiff need not prove

that retaliation was the only motivating factor for an adverse action, the plaintiff must show that

retaliation was the determinative factor."  *Id.* at 129 (cleaned up).  A plaintiff may do so in two

ways:  "either by proving that a discriminatory motive, more likely than not, motivated the

defendants or by proving both that the reasons given by the defendants are not true and that

discrimination is the real reason for the actions."  *Id.* (cleaned up).  "A plaintiff may prove that

retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered . . . reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). For example, "evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer in the Title VII context are pretextual." *Summa*, 708 F.3d at 130.  "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.  However, a plaintiff may rely on evidence comprising her *prima facie* case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Kwan*, 737 F.3d at 847.

Plaintiffs raise several arguments why the reason for their termination is pretextual, but they are not persuasive, individually or in combination.  First, Plaintiffs note that they received average or above-average performance reviews in 2016, and Mancini and Estevez received promotions and pay increases less than a year before they were terminated.  (*See* Ps' Opp. at 1, 28; Nanau Decl. Exs. 18-20.)  But this was all before the leadership reorganization at White Plains, and as Defendants point out, "'a new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations.'"  (Ds' Reply at 9 (quoting *Beers v. NYNEX Material Enters. Co.*, No. 88-CV-305, 1992 WL 8299, at *11 (S.D.N.Y. Jan. 13, 1992)).)  Orsini having stricter standards than her predecessor does not show pretext.  Further, "courts have typically found evidence such as positive performance reviews, bonuses, and salary increases sufficient to establish pretext only when paired with other evidence demonstrating a discriminatory motive." *Forte v. Liquidnet Holdings, Inc.*, No. 14-CV-2185, 2015 WL 5820976, at *11 (S.D.N.Y. Sept. 30, 2015), *aff'd*,

675 F. App'x 21 (2d Cir. 2017) (summary order).  Accordingly, Plaintiffs' previous performance reviews and promotions, standing alone, are insufficient for a reasonable juror to conclude that their poor performance in 2017 was a pretextual reason for their termination.

Second, Plaintiffs argue that pretext is demonstrated by Gilliam's disagreement with Plaintiffs' termination and the fact that Martinez and Havelka tried to persuade Mancini to work at the New York City campus.  (Ps' Opp. at 11-12, 28-29.)  But "differences between supervisors' reviews of an employee's performance are generally insufficient to demonstrate pretext."  *Forte*, 2015 WL 5820976, at *11.  Moreover, no one disagreed with the assessment that Plaintiffs were performing poorly; they "only disagreed as to the appropriate penalty." *Abdullah v. Skandinaviska Enskilda Banken Corp.*, No. 98-CV-7398, 1999 WL 945238, at *6 (S.D.N.Y. Oct. 19, 1999).  Gilliam believed that Plaintiffs should be given more time to deal with their performance issues, (Nanau Decl. Ex. 8 at 121:19-122:7), and Martinez believed that Mancini could still be useful at Berkeley, (*see id.* Ex. 28).  "Such a difference of opinion provides no evidence of either pretext or discriminatory motivation."  *Abdullah*, 1999 WL 945238, at *6.

Third, Plaintiffs contend that there is a factual dispute regarding how performance at Berkeley was measured.  (Ps' Opp. at 29.)  Specifically, they assert that performance was measured annually with performance reviews, not quarterly reports, and that supervisors at Berkeley did not regularly enforce compliance with the call and enrollment quotas.  (*See id.* at 4-5.)  But even if such a dispute existed, it would not be material, because it would not prove that the reason given for Plaintiffs' termination is not true or that discrimination is the real reason for their termination – or even a motivating factor.  Plaintiffs' PIPs warned that failure to meet their objectives could result in further corrective action, including termination of employment.  Even

if that threat was not regularly carried out under the prior leadership, without more evidence –

for example, disparate treatment of similarly situated individuals by the decisionmakers here –

there is nothing from which a reasonable jury could infer that Defendants' proffered reason for

Plaintiffs' termination was pretextual.[22]

Finally, Plaintiffs argue that the close temporal proximity between Mancini's July 2017

complaint and Plaintiffs' termination creates a triable issue of fact regarding whether retaliation

was the but-for cause of their termination.  (Ps' Opp. at 29.)  It does not.  "The temporal

proximity of events may give rise to an inference of retaliation for the purposes of establishing a

*prima facie* case of retaliation under Title VII, but without more, such temporal proximity is

insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext."  *El Sayed*

*v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (*per curiam*); *accord Chen*, 805 F.3d at

72 (noting that the Second Circuit has "long held that temporal proximity between a protected

complaint and an adverse employment action is insufficient to satisfy plaintiff's burden to bring

forward some evidence of pretext") (cleaned up).  As Plaintiffs have not produced any evidence

of pretext, the mere fact that Plaintiffs were terminated two months after Mancini's email to

Gilliam is insufficient to raise a genuine issue of material fact as to whether a desire to retaliate

was the but-for cause of their termination.

In sum, because Plaintiffs' complaints were not protected activity or, alternatively,

because Defendants have articulated a legitimate, nonretaliatory reason for their termination and

---

[22] Plaintiffs do not argue that Orsini's decision not to terminate Ovimeleh is evidence of disparate treatment of a similarly situated individual, and the Court declines to consider the issue *sua sponte*.  *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) (under the adversarial system, "courts are generally limited to addressing the claims and arguments advanced by the parties" and "do not usually raise claims or arguments on their own").

Plaintiffs have failed to show that retaliation was a but-for cause of their termination, Defendants are entitled to summary judgment on Plaintiffs' Title VII and NYSHRL retaliation claims.

### C.      Aiding and Abetting

Absent an underlying NYSHRL violation, Plaintiffs' aiding and abetting claims must be dismissed as well.  *See Boonmalert v. City of N.Y.*, 721 F. App'x 29, 34 (2d Cir. 2018) (summary order); *Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 347-48 (S.D.N.Y. 2020).

## IV.      CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 68), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated: July 19, 2021
           White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.